# HURLEY ET AL. v. IRISH-AMERICAN GAY, LESBIAN AND BISEXUAL GROUP OF BOSTON, INC., ET AL.

No. 94–749. Argued April 25, 1995—Decided June 19, 1995

SOUTER, J., delivered the opinion for a unanimous Court.

*Chester Darling* argued the cause for petitioners. With him on the briefs were *Dwight G. Duncan* and *William M. Connolly.*

*John Ward* argued the cause for respondents. With him on the brief were *David Duncan, Gretchen Van Ness, Gary Buseck, Mary Bonauto, Larry W. Yackle,* and *Charles S. Sims.**

JUSTICE SOUTER delivered the opinion of the Court.

The issue in this case is whether Massachusetts may require private citizens who organize a parade to include among the marchers a group imparting a message the organizers do not wish to convey. We hold that such a mandate violates the First Amendment.

---

*Briefs of *amici curiae* urging reversal were filed for the Boy Scouts of America by *George A. Davidson, Carla A. Kerr,* and *David K. Park;* for the Catholic War Veterans of the United States of America, Inc., by *John P. Hale;* for the Center for Individual Rights et al. by *Gary B. Born, Ernest L. Mathews, Jr., Maura R. Cahill,* and *Michael P. McDonald;* and for the Christian Legal Society et al. by *Steven T. McFarland, Samuel B. Casey,* and *Gregory S. Baylor.*

Briefs of *amici curiae* urging affirmance were filed for the Anti-Defamation League et al. by *Walter A. Smith, Jr., Thomas N. Bulleit, Jr., Steven M. Freeman, Arlene B. Mayerson, Antonia Hernandez, Alice E. Zaft, Judith L. Lichtman,* and *Donna R. Lenhoff;* and for the Irish Lesbian and Gay Organization et al. by *R. Paul Wickes* and *Michael E. Deutsch.*

*Burt Neuborne, Steven R. Shapiro,* and *Marjorie Heins* filed a brief for the American Civil Liberties Union as *amicus curiae.*

I

March 17 is set aside for two celebrations in South Boston. As early as 1737, some people in Boston observed the feast of the apostle to Ireland, and since 1776 the day has marked the evacuation of royal troops and Loyalists from the city, prompted by the guns captured at Ticonderoga and set up on Dorchester Heights under General Washington's command. Washington himself reportedly drew on the earlier tradition in choosing "St. Patrick" as the response to "Boston," the password used in the colonial lines on evacuation day. See J. Crimmins, St. Patrick's Day: Its Celebration in New York and other American Places, 1737–1845, pp. 15, 19 (1902); see generally 1 H. Commager & R. Morris, The Spirit of 'Seventy Six, pp. 138–183 (1958); The American Book of Days 262–265 (J. Hatch ed., 3d ed. 1978). Although the General Court of Massachusetts did not officially designate March 17 as Evacuation Day until 1938, see Mass. Gen. Laws § 6:12K (1992), the City Council of Boston had previously sponsored public celebrations of Evacuation Day, including notable commemorations on the centennial in 1876, and on the 125th anniversary in 1901, with its parade, salute, concert, and fireworks display. See Celebration of the Centennial Anniversary of the Evacuation of Boston by the British Army (G. Ellis ed. 1876); *Irish-American Gay, Lesbian and Bisexual Group of Boston* v. *City of Boston et al.*, Civ. Action No. 92–1518A (Super. Ct., Mass., Dec. 15, 1993), reprinted in App. to Pet. for Cert. B1, B8–B9.

The tradition of formal sponsorship by the city came to an end in 1947, however, when Mayor James Michael Curley himself granted authority to organize and conduct the St. Patrick's Day-Evacuation Day Parade to the petitioner South Boston Allied War Veterans Council, an unincorporated association of individuals elected from various South Boston veterans groups. Every year since that time, the Council has applied for and received a permit for the parade, which at times has included as many as 20,000 marchers and drawn

up to 1 million watchers. No other applicant has ever applied for that permit. *Id.*, at B9. Through 1992, the city allowed the Council to use the city's official seal, and provided printing services as well as direct funding.

In 1992, a number of gay, lesbian, and bisexual descendants of the Irish immigrants joined together with other supporters to form the respondent organization, GLIB, to march in the parade as a way to express pride in their Irish heritage as openly gay, lesbian, and bisexual individuals, to demonstrate that there are such men and women among those so descended, and to express their solidarity with like individuals who sought to march in New York's St. Patrick's Day Parade. *Id.*, at B3; App. 51. Although the Council denied GLIB's application to take part in the 1992 parade, GLIB obtained a state-court order to include its contingent, which marched "uneventfully" among that year's 10,000 participants and 750,000 spectators. App. to Pet. for Cert. B3, and n. 4.

In 1993, after the Council had again refused to admit GLIB to the upcoming parade, the organization and some of its members filed this suit against the Council, the individual petitioner John J. "Wacko" Hurley, and the city of Boston, alleging violations of the State and Federal Constitutions and of the state public accommodations law, which prohibits "any distinction, discrimination or restriction on account of . . . sexual orientation . . . relative to the admission of any person to, or treatment in any place of public accommodation, resort or amusement." Mass. Gen. Laws § 272:98 (1992). After finding that "[f]or at least the past 47 years, the Parade has traveled the same basic route along the public streets of South Boston, providing entertainment, amusement, and recreation to participants and spectators alike," App. to Pet. for Cert. B5–B6, the state trial court ruled that the parade fell within the statutory definition of a public accommodation, which includes "any place . . . which is open to and accepts or solicits the patronage of the general public

and, without limiting the generality of this definition, whether or not it be . . . (6) a boardwalk or other public highway [or] . . . (8) a place of public amusement, recreation, sport, exercise or entertainment," Mass. Gen. Laws § 272:92A (1992). The court found that the Council had no written criteria and employed no particular procedures for admission, voted on new applications in batches, had occasionally admitted groups who simply showed up at the parade without having submitted an application, and did "not generally inquire into the specific messages or views of each applicant." App. to Pet. for Cert. B8–B9. The court consequently rejected the Council's contention that the parade was "private" (in the sense of being exclusive), holding instead that "the lack of genuine selectivity in choosing participants and sponsors demonstrates that the Parade is a public event." *Id.*, at B6. It found the parade to be "eclectic," containing a wide variety of "patriotic, commercial, political, moral, artistic, religious, athletic, public service, trade union, and eleemosynary themes," as well as conflicting messages. *Id.*, at B24. While noting that the Council had indeed excluded the Ku Klux Klan and ROAR (an antibusing group), *id.*, at B7, it attributed little significance to these facts, concluding ultimately that "[t]he only common theme among the participants and sponsors is their public involvement in the Parade," *id.*, at B24.

The court rejected the Council's assertion that the exclusion of "groups with sexual themes merely formalized [the fact] that the Parade expresses traditional religious and social values," *id.*, at B3, and found the Council's "final position [to be] that GLIB would be excluded because of its values and its message, *i. e.*, its members' sexual orientation," *id.*, at B4, n. 5, citing Tr. of Closing Arg. 43, 51–52 (Nov. 23, 1993). This position, in the court's view, was not only violative of the public accommodations law but "paradoxical" as well, since "a proper celebration of St. Patrick's and Evacuation Day requires diversity and inclusiveness." App. to Pet. for

Cert. B24. The court rejected the notion that GLIB's admission would trample on the Council's First Amendment rights since the court understood that constitutional protection of any interest in expressive association would "requir[e] focus on a specific message, theme, or group" absent from the parade. *Ibid.* "Given the [Council's] lack of selectivity in choosing participants and failure to circumscribe the marchers' message," the court found it "impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment." *Id.,* at B25. It concluded that the parade is "not an exercise of [the Council's] constitutionally protected right of expressive association," but instead "an open recreational event that is subject to the public accommodations law." *Id.,* at B27.

The court held that because the statute did not mandate inclusion of GLIB but only prohibited discrimination based on sexual orientation, any infringement on the Council's right to expressive association was only "incidental" and "no greater than necessary to accomplish the statute's legitimate purpose" of eradicating discrimination. *Id.,* at B25, citing *Roberts* v. *United States Jaycees,* 468 U. S. 609, 628–629 (1984). Accordingly, it ruled that "GLIB is entitled to participate in the Parade on the same terms and conditions as other participants." App. to Pet. for Cert. B27.[1]

The Supreme Judicial Court of Massachusetts affirmed, seeing nothing clearly erroneous in the trial judge's findings

---

[1] The court dismissed the public accommodations law claim against the city because it found that the city's actions did not amount to inciting or assisting in the Council's violations of § 272:98. App. to Pet. for Cert. B12–B13. It also dismissed respondents' First and Fourteenth Amendment challenge against the Council for want of state action triggering the proscriptions of those Amendments. *Id.,* at B14–B22. Finally, the court did not reach the state constitutional questions, since respondents had apparently assumed in their arguments that those claims, too, depended for their success upon a finding of state action and because of the court's holding that the public accommodation statutes apply to the parade. *Id.,* at B22.

that GLIB was excluded from the parade based on the sexual orientation of its members, that it was impossible to detect an expressive purpose in the parade, that there was no state action, and that the parade was a public accommodation within the meaning of § 272:92A. *Irish-American Gay, Lesbian and Bisexual Group of Boston* v. *Boston*, 418 Mass. 238, 242–248, 636 N. E. 2d 1293, 1295–1298 (1994).[2] Turning to petitioners' First Amendment claim that application of the public accommodations law to the parade violated their freedom of speech (as distinguished from their right to expressive association, raised in the trial court), the court's majority held that it need not decide on the particular First Amendment theory involved "because, as the [trial] judge found, it is 'impossible to discern any specific expressive purpose entitling the Parade to protection under the First Amendment.'" *Id.*, at 249, 636 N. E. 2d, at 1299 (footnote omitted). The defendants had thus failed at the trial level "to demonstrate that the parade truly was an exercise of . . . First Amendment rights," *id.*, at 250, 636 N. E. 2d, at 1299, citing *Clark* v. *Community for Creative Non-Violence*, 468 U. S. 288, 293, n. 5 (1984), and on appeal nothing indicated to the majority of the Supreme Judicial Court that the trial judge's assessment of the evidence on this point was clearly erroneous, 418 Mass., at 250, 636 N. E. 2d, at 1299. The court rejected petitioners' further challenge to the law as overbroad, holding that it does not, on its face, regulate speech, does not let public officials examine the content of speech, and would not be interpreted as reaching speech. *Id.*, at 251–252, 636 N. E. 2d, at 1300. Finally, the court rejected the challenge that the public accommodations law was unconstitutionally vague, holding that this case did not present an issue of speech and that the law gave persons of

---

[2] Since respondents did not cross-appeal the dismissal of their claims against the city, the Supreme Judicial Court declined to reach those claims. 418 Mass., at 245, n. 12, 636 N. E. 2d, at 1297.

ordinary intelligence a reasonable opportunity to know what was prohibited. *Id.,* at 252, 636 N. E. 2d, at 1300–1301.

Justice Nolan dissented. In his view, the Council "does not need a narrow or distinct theme or message in its parade for it to be protected under the First Amendment." *Id.,* at 256, 636 N. E. 2d, at 1303. First, he wrote, even if the parade had no message at all, GLIB's particular message could not be forced upon it. *Id.,* at 257, 636 N. E. 2d, at 1303, citing *Wooley* v. *Maynard,* 430 U. S. 705, 717 (1977) (state requirement to display "Live Free or Die" on license plates violates First Amendment). Second, according to Justice Nolan, the trial judge clearly erred in finding the parade devoid of expressive purpose. 418 Mass., at 257, 636 N. E. 2d, at 1303. He would have held that the Council, like any expressive association, cannot be barred from excluding applicants who do not share the views the Council wishes to advance. *Id.,* at 257–259, 636 N. E. 2d, at 1303–1304, citing *Roberts, supra.* Under either a pure speech or associational theory, the State's purpose of eliminating discrimination on the basis of sexual orientation, according to the dissent, could be achieved by more narrowly drawn means, such as ordering admission of individuals regardless of sexual preference, without taking the further step of prohibiting the Council from editing the views expressed in their parade. 418 Mass., at 256, 258, 636 N. E. 2d, at 1302, 1304. In Justice Nolan's opinion, because GLIB's message was separable from the status of its members, such a narrower order would accommodate the State's interest without the likelihood of infringing on the Council's First Amendment rights. Finally, he found clear error in the trial judge's equation of exclusion on the basis of GLIB's message with exclusion on the basis of its members' sexual orientation. To the dissent this appeared false in the light of "overwhelming evidence" that the Council objected to GLIB on account of its message and a dearth of testimony or documentation indicating that sexual orientation was the bar to admission. *Id.,* at 260, 636

N. E. 2d, at 1304. The dissent accordingly concluded that the Council had not even violated the State's public accommodations law.

We granted certiorari to determine whether the requirement to admit a parade contingent expressing a message not of the private organizers' own choosing violates the First Amendment. 513 U. S. 1071 (1995). We hold that it does and reverse.

## II

Given the scope of the issues as originally joined in this case, it is worth noting some that have fallen aside in the course of the litigation, before reaching us. Although the Council presents us with a First Amendment claim, respondents do not. Neither do they press a claim that the Council's action has denied them equal protection of the laws in violation of the Fourteenth Amendment. While the guarantees of free speech and equal protection guard only against encroachment by the government and "erec[t] no shield against merely private conduct," *Shelley* v. *Kraemer*, 334 U. S. 1, 13 (1948); see *Hudgens* v. *NLRB*, 424 U. S. 507, 513 (1976), respondents originally argued that the Council's conduct was not purely private, but had the character of state action. The trial court's review of the city's involvement led it to find otherwise, however, and although the Supreme Judicial Court did not squarely address the issue, it appears to have affirmed the trial court's decision on that point as well as the others. In any event, respondents have not brought that question up either in a cross-petition for certiorari or in their briefs filed in this Court. When asked at oral argument whether they challenged the conclusion by the Massachusetts' courts that no state action is involved in the parade, respondents' counsel answered that they "do not press that issue here." Tr. of Oral Arg. 22. In this Court, then, their claim for inclusion in the parade rests solely on the Massachusetts public accommodations law.

There is no corresponding concession from the other side, however, and certainly not to the state courts' characterization of the parade as lacking the element of expression for purposes of the First Amendment. Accordingly, our review of petitioners' claim that their activity is indeed in the nature of protected speech carries with it a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court. See *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 499 (1984). The "requirement of independent appellate review . . . is a rule of federal constitutional law," *id.*, at 510, which does not limit our deference to a trial court on matters of witness credibility, *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U. S. 657, 688 (1989), but which generally requires us to "review the finding of facts by a State court . . . where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts," *Fiske* v. *Kansas*, 274 U. S. 380, 385–386 (1927). See also *Niemotko* v. *Maryland*, 340 U. S. 268, 271 (1951); *Jacobellis* v. *Ohio*, 378 U. S. 184, 189 (1964) (opinion of Brennan, J.). This obligation rests upon us simply because the reaches of the First Amendment are ultimately defined by the facts it is held to embrace, and we must thus decide for ourselves whether a given course of conduct falls on the near or far side of the line of constitutional protection. See *Bose Corp., supra*, at 503. Even where a speech case has originally been tried in a federal court, subject to the provision of Federal Rule of Civil Procedure 52(a) that "[f]indings of fact . . . shall not be set aside unless clearly erroneous," we are obliged to make a fresh examination of crucial facts. Hence, in this case, though we are confronted with the state courts' conclusion that the factual characteristics of petitioners' activity place it within the vast realm of nonexpressive conduct, our obligation is to " 'make an independent examina-

tion of the whole record,' . . . so as to assure ourselves that th[is] judgment does not constitute a forbidden intrusion on the field of free expression." *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 285 (1964) (footnote omitted), quoting *Edwards* v. *South Carolina,* 372 U. S. 229, 235 (1963).

## III

### A

If there were no reason for a group of people to march from here to there except to reach a destination, they could make the trip without expressing any message beyond the fact of the march itself. Some people might call such a procession a parade, but it would not be much of one. Real "[p]arades are public dramas of social relations, and in them performers define who can be a social actor and what subjects and ideas are available for communication and consideration." S. Davis, Parades and Power: Street Theatre in Nineteenth-Century Philadelphia 6 (1986). Hence, we use the word "parade" to indicate marchers who are making some sort of collective point, not just to each other but to bystanders along the way. Indeed, a parade's dependence on watchers is so extreme that nowadays, as with Bishop Berkeley's celebrated tree, "if a parade or demonstration receives no media coverage, it may as well not have happened." *Id.,* at 171. Parades are thus a form of expression, not just motion, and the inherent expressiveness of marching to make a point explains our cases involving protest marches. In *Gregory* v. *Chicago,* 394 U. S. 111, 112 (1969), for example, petitioners had taken part in a procession to express their grievances to the city government, and we held that such a "march, if peaceful and orderly, falls well within the sphere of conduct protected by the First Amendment." Similarly, in *Edwards* v. *South Carolina, supra,* at 235, where petitioners had joined in a march of protest and pride, carrying placards and singing The Star Spangled Banner, we held that the activities "reflect an exercise of these basic constitutional

rights in their most pristine and classic form." Accord, *Shuttlesworth* v. *Birmingham,* 394 U. S. 147, 152 (1969).

The protected expression that inheres in a parade is not limited to its banners and songs, however, for the Constitution looks beyond written or spoken words as mediums of expression. Noting that "[s]ymbolism is a primitive but effective way of communicating ideas," *West Virginia Bd. of Ed.* v. *Barnette,* 319 U. S. 624, 632 (1943), our cases have recognized that the First Amendment shields such acts as saluting a flag (and refusing to do so), *id.,* at 632, 642, wearing an armband to protest a war, *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 505–506 (1969), displaying a red flag, *Stromberg* v. *California,* 283 U. S. 359, 369 (1931), and even "[m]arching, walking or parading" in uniforms displaying the swastika, *National Socialist Party of America* v. *Skokie,* 432 U. S. 43 (1977). As some of these examples show, a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a "particularized message," cf. *Spence* v. *Washington,* 418 U. S. 405, 411 (1974) *(per curiam),* would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll.

Not many marches, then, are beyond the realm of expressive parades, and the South Boston celebration is not one of them. Spectators line the streets; people march in costumes and uniforms, carrying flags and banners with all sorts of messages (*e. g.,* "England get out of Ireland," "Say no to drugs"); marching bands and pipers play; floats are pulled along; and the whole show is broadcast over Boston television. See Record, Exh. 84 (video). To be sure, we agree with the state courts that in spite of excluding some applicants, the Council is rather lenient in admitting participants. But a private speaker does not forfeit constitutional protection simply by combining multifarious voices, or by failing to edit their themes to isolate an exact message as the exclusive

subject matter of the speech. Nor, under our precedent, does First Amendment protection require a speaker to generate, as an original matter, each item featured in the communication. Cable operators, for example, are engaged in protected speech activities even when they only select programming originally produced by others. *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622, 636 (1994) ("Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment"). For that matter, the presentation of an edited compilation of speech generated by other persons is a staple of most newspapers' opinion pages, which, of course, fall squarely within the core of First Amendment security, *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241, 258 (1974), as does even the simple selection of a paid noncommercial advertisement for inclusion in a daily paper, see *New York Times*, 376 U. S., at 265–266. The selection of contingents to make a parade is entitled to similar protection.

Respondents' participation as a unit in the parade was equally expressive. GLIB was formed for the very purpose of marching in it, as the trial court found, in order to celebrate its members' identity as openly gay, lesbian, and bisexual descendants of the Irish immigrants, to show that there are such individuals in the community, and to support the like men and women who sought to march in the New York parade. App. to Pet. for Cert. B3. The organization distributed a fact sheet describing the members' intentions, App. A51, and the record otherwise corroborates the expressive nature of GLIB's participation, see Record, Exh. 84 (video); App. A67 (photograph). In 1993, members of GLIB marched behind a shamrock-strewn banner with the simple inscription "Irish American Gay, Lesbian and Bisexual Group of Boston." GLIB understandably seeks to communicate its ideas as part of the existing parade, rather than staging one of its own.

## B

The Massachusetts public accommodations law under which respondents brought suit has a venerable history. At common law, innkeepers, smiths, and others who "made profession of a public employment," were prohibited from refusing, without good reason, to serve a customer. *Lane* v. *Cotton,* 12 Mod. 472, 484–485, 88 Eng. Rep. 1458, 1464–1465 (K. B. 1701) (Holt, C. J.); see *Bell* v. *Maryland,* 378 U. S. 226, 298, n. 17 (1964) (Goldberg, J., concurring); *Lombard* v. *Louisiana,* 373 U. S. 267, 277 (1963) (Douglas, J., concurring). As one of the 19th-century English judges put it, the rule was that "[t]he innkeeper is not to select his guests[;] [h]e has no right to say to one, you shall come into my inn, and to another you shall not, as every one coming and conducting himself in a proper manner has a right to be received; and for this purpose innkeepers are a sort of public servants." *Rex* v. *Ivens,* 7 Car. & P. 213, 219, 173 Eng. Rep. 94, 96 (N. P. 1835); M. Konvitz & T. Leskes, A Century of Civil Rights 160 (1961).

After the Civil War, the Commonwealth of Massachusetts was the first State to codify this principle to ensure access to public accommodations regardless of race. See Act Forbidding Unjust Discrimination on Account of Color or Race, 1865 Mass. Acts, ch. 277 (May 16, 1865); Konvitz & Leskes, *supra,* at 155–156; Lerman & Sanderson, Discrimination in Access to Public Places: A Survey of State and Federal Public Accommodations Laws, 7 N. Y. U. Rev. L. & Soc. Change 215, 238 (1978); Fox, Discrimination and Antidiscrimination in Massachusetts Law, 44 B. U. L. Rev. 30, 58 (1964). In prohibiting discrimination "in any licensed inn, in any public place of amusement, public conveyance or public meeting," 1865 Mass. Acts, ch. 277, § 1, the original statute already expanded upon the common law, which had not conferred any right of access to places of public amusement, Lerman & Sanderson, *supra,* at 248. As with many public accommodations statutes across the Nation, the legislature continued to

broaden the scope of legislation, to the point that the law today prohibits discrimination on the basis of "race, color, religious creed, national origin, sex, sexual orientation . . . , deafness, blindness or any physical or mental disability or ancestry" in "the admission of any person to, or treatment in any place of public accommodation, resort or amusement." Mass. Gen. Laws § 272:98 (1992). Provisions like these are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments. See, *e. g.*, *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 11–16 (1988); *Roberts* v. *United States Jaycees*, 468 U. S., at 624–626; *Heart of Atlanta Motel, Inc.* v. *United States*, 379 U. S. 241, 258–262 (1964). Nor is this statute unusual in any obvious way, since it does not, on its face, target speech or discriminate on the basis of its content, the focal point of its prohibition being rather on the act of discriminating against individuals in the provision of publicly available goods, privileges, and services on the proscribed grounds.

## C

In the case before us, however, the Massachusetts law has been applied in a peculiar way. Its enforcement does not address any dispute about the participation of openly gay, lesbian, or bisexual individuals in various units admitted to the parade. Petitioners disclaim any intent to exclude homosexuals as such, and no individual member of GLIB claims to have been excluded from parading as a member of any group that the Council has approved to march. Instead, the disagreement goes to the admission of GLIB as its own parade unit carrying its own banner. See App. to Pet. for Cert. B26–B27, and n. 28. Since every participating unit affects the message conveyed by the private organizers, the state courts' application of the statute produced an order essentially requiring petitioners to alter the expressive content

of their parade. Although the state courts spoke of the parade as a place of public accommodation, see, *e. g.,* 418 Mass., at 247–248, 636 N. E. 2d, at 1297–1298, once the expressive character of both the parade and the marching GLIB contingent is understood, it becomes apparent that the state courts' application of the statute had the effect of declaring the sponsors' speech itself to be the public accommodation. Under this approach any contingent of protected individuals with a message would have the right to participate in petitioners' speech, so that the communication produced by the private organizers would be shaped by all those protected by the law who wished to join in with some expressive demonstration of their own. But this use of the State's power violates the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.

"Since *all* speech inherently involves choices of what to say and what to leave unsaid," *Pacific Gas & Electric Co.* v. *Public Utilities Comm'n of Cal.,* 475 U. S. 1, 11 (1986) (plurality opinion) (emphasis in original), one important manifestation of the principle of free speech is that one who chooses to speak may also decide "what not to say," *id.,* at 16. Although the State may at times "prescribe what shall be orthodox in commercial advertising" by requiring the dissemination of "purely factual and uncontroversial information," *Zauderer* v. *Office of Disciplinary Counsel of Supreme Court of Ohio,* 471 U. S. 626, 651 (1985); see *Pittsburgh Press Co.* v. *Pittsburgh Comm'n on Human Relations,* 413 U. S. 376, 386–387 (1973), outside that context it may not compel affirmance of a belief with which the speaker disagrees, see *Barnette,* 319 U. S., at 642. Indeed this general rule, that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid, *McIntyre* v. *Ohio Elections Comm'n,* 514 U. S. 334, 341–342 (1995); *Riley* v. *National Federation of Blind of N. C., Inc.,*

487 U. S. 781, 797–798 (1988), subject, perhaps, to the permissive law of defamation, *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964); *Gertz* v. *Robert Welch, Inc.,* 418 U. S. 323, 347–349 (1974); *Hustler Magazine, Inc.* v. *Falwell,* 485 U. S. 46 (1988). Nor is the rule's benefit restricted to the press, being enjoyed by business corporations generally and by ordinary people engaged in unsophisticated expression as well as by professional publishers. Its point is simply the point of all speech protection, which is to shield just those choices of content that in someone's eyes are misguided, or even hurtful. See *Brandenburg* v. *Ohio,* 395 U. S. 444 (1969); *Terminiello* v. *Chicago,* 337 U. S. 1 (1949).

Petitioners' claim to the benefit of this principle of autonomy to control one's own speech is as sound as the South Boston parade is expressive. Rather like a composer, the Council selects the expressive units of the parade from potential participants, and though the score may not produce a particularized message, each contingent's expression in the Council's eyes comports with what merits celebration on that day. Even if this view gives the Council credit for a more considered judgment than it actively made, the Council clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another. The message it disfavored is not difficult to identify. Although GLIB's point (like the Council's) is not wholly articulate, a contingent marching behind the organization's banner would at least bear witness to the fact that some Irish are gay, lesbian, or bisexual, and the presence of the organized marchers would suggest their view that people of their sexual orientations have as much claim to unqualified social acceptance as heterosexuals and indeed as members of parade units organized around other identifying characteristics. The parade's organizers may not believe these facts about Irish sexuality to be so, or they may object to unqualified

social acceptance of gays and lesbians or have some other reason for wishing to keep GLIB's message out of the parade. But whatever the reason, it boils down to the choice of a speaker not to propound a particular point of view, and that choice is presumed to lie beyond the government's power to control.

Respondents argue that any tension between this rule and the Massachusetts law falls short of unconstitutionality, citing the most recent of our cases on the general subject of compelled access for expressive purposes, *Turner Broadcasting System, Inc.* v. *FCC*, 512 U. S. 622 (1994). There we reviewed regulations requiring cable operators to set aside channels for designated broadcast signals, and applied only intermediate scrutiny. *Id.*, at 662. Respondents contend on this authority that admission of GLIB to the parade would not threaten the core principle of speaker's autonomy because the Council, like a cable operator, is merely "a conduit" for the speech of participants in the parade "rather than itself a speaker." Brief for Respondents 21. But this metaphor is not apt here, because GLIB's participation would likely be perceived as having resulted from the Council's customary determination about a unit admitted to the parade, that its message was worthy of presentation and quite possibly of support as well. A newspaper, similarly, "is more than a passive receptacle or conduit for news, comment, and advertising," and we have held that "[t]he choice of material . . . and the decisions made as to limitations on the size and content . . . and treatment of public issues . . .—whether fair or unfair—constitute the exercise of editorial control and judgment" upon which the State can not intrude. *Tornillo*, 418 U. S., at 258. Indeed, in *Pacific Gas & Electric*, we invalidated coerced access to the envelope of a private utility's bill and newsletter because the utility "may be forced either to appear to agree with [the intruding leaflet] or to respond." 475 U. S., at 15 (plurality opinion) (citation omitted). The plurality made the further point that if "the government

[were] freely able to compel . . . speakers to propound political messages with which they disagree, . . . protection [of a speaker's freedom] would be empty, for the government could require speakers to affirm in one breath that which they deny in the next." *Id.,* at 16. Thus, when dissemination of a view contrary to one's own is forced upon a speaker intimately connected with the communication advanced, the speaker's right to autonomy over the message is compromised.

In *Turner Broadcasting,* we found this problem absent in the cable context, because "[g]iven cable's long history of serving as a conduit for broadcast signals, there appears little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator." 512 U. S., at 655. We stressed that the viewer is frequently apprised of the identity of the broadcaster whose signal is being received via cable and that it is "common practice for broadcasters to disclaim any identity of viewpoint between the management and the speakers who use the broadcast facility." *Ibid.* (citation omitted); see *id.,* at 684 (O'CONNOR, J., concurring in part and dissenting in part) (noting that Congress "might . . . conceivably obligate cable operators to act as common carriers for some of their channels").

Parades and demonstrations, in contrast, are not understood to be so neutrally presented or selectively viewed. Unlike the programming offered on various channels by a cable network, the parade does not consist of individual, unrelated segments that happen to be transmitted together for individual selection by members of the audience. Although each parade unit generally identifies itself, each is understood to contribute something to a common theme, and accordingly there is no customary practice whereby private sponsors disavow "any identity of viewpoint" between themselves and the selected participants. Practice follows practicability here, for such disclaimers would be quite curious in a moving

parade. Cf. *PruneYard Shopping Center* v. *Robins*, 447 U. S. 74, 87 (1980) (owner of shopping mall "can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand"). Without deciding on the precise significance of the likelihood of misattribution, it nonetheless becomes clear that in the context of an expressive parade, as with a protest march, the parade's overall message is distilled from the individual presentations along the way, and each unit's expression is perceived by spectators as part of the whole.

An additional distinction between *Turner Broadcasting* and this case points to the fundamental weakness of any attempt to justify the state-court order's limitation on the Council's autonomy as a speaker. A cable is not only a conduit for speech produced by others and selected by cable operators for transmission, but a franchised channel giving monopolistic opportunity to shut out some speakers. This power gives rise to the Government's interest in limiting monopolistic autonomy in order to allow for the survival of broadcasters who might otherwise be silenced and consequently destroyed. The Government's interest in *Turner Broadcasting* was not the alteration of speech, but the survival of speakers. In thus identifying an interest going beyond abridgment of speech itself, the defenders of the law at issue in *Turner Broadcasting* addressed the threshold requirement of any review under the Speech Clause, whatever the ultimate level of scrutiny, that a challenged restriction on speech serve a compelling, or at least important, governmental object, see, *e. g.*, *Pacific Gas & Electric, supra*, at 19; *Turner Broadcasting, supra*, at 662; *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968).

In this case, of course, there is no assertion comparable to the *Turner Broadcasting* claim that some speakers will be destroyed in the absence of the challenged law. True, the size and success of petitioners' parade makes it an enviable vehicle for the dissemination of GLIB's views, but that fact,

without more, would fall far short of supporting a claim that petitioners enjoy an abiding monopoly of access to spectators. See·App. to Pet. for Cert. B9; Brief for Respondents 10 (citing trial court's finding that no other applicant has applied for the permit). Considering that GLIB presumably would have had a fair shot (under neutral criteria developed by the city) at obtaining a parade permit of its own, respondents have not shown that petitioners enjoy the capacity to "silence the voice of competing speakers," as cable operators do with respect to program providers who wish to reach subscribers, *Turner Broadcasting, supra,* at 656. Nor has any other legitimate interest been identified in support of applying the Massachusetts statute in this way to expressive activity like the parade.

The statute, Mass. Gen. Laws § 272:98 (1992), is a piece of protective legislation that announces no purpose beyond the object both expressed and apparent in its provisions, which is to prevent any denial of access to (or discriminatory treatment in) public accommodations on proscribed grounds, including sexual orientation. On its face, the object of the law is to ensure by statute for gays and lesbians desiring to make use of public accommodations what the old common law promised to any member of the public wanting a meal at the inn, that accepting the usual terms of service, they will not be turned away merely on the proprietor's exercise of personal preference. When the law is applied to expressive activity in the way it was done here, its apparent object is simply to require speakers to modify the content of their expression to whatever extent beneficiaries of the law choose to alter it with messages of their own. But in the absence of some further, legitimate end, this object is merely to allow exactly what the general rule of speaker's autonomy forbids.

It might, of course, have been argued that a broader objective is apparent: that the ultimate point of forbidding acts of discrimination toward certain classes is to produce a society free of the corresponding biases. Requiring access to a

speaker's message would thus be not an end in itself, but a means to produce speakers free of the biases, whose expressive conduct would be at least neutral toward the particular classes, obviating any future need for correction. But if this indeed is the point of applying the state law to expressive conduct, it is a decidedly fatal objective. Having availed itself of the public thoroughfares "for purposes of assembly [and] communicating thoughts between citizens," the Council is engaged in a use of the streets that has "from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague* v. *Committee for Industrial Organization*, 307 U. S. 496, 515 (1939) (opinion of Roberts, J.). Our tradition of free speech commands that a speaker who takes to the street corner to express his views in this way should be free from interference by the State based on the content of what he says. See, *e. g., Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972); cf. H. Kalven, A Worthy Tradition 6–19 (1988); Fiss, Free Speech and Social Structure, 71 Iowa L. Rev. 1405, 1408–1409 (1986). The very idea that a noncommercial speech restriction be used to produce thoughts and statements acceptable to some groups or, indeed, all people, grates on the First Amendment, for it amounts to nothing less than a proposal to limit speech in the service of orthodox expression. The Speech Clause has no more certain antithesis. See, *e. g., Barnette*, 319 U. S., at 642; *Pacific Gas & Electric*, 475 U. S., at 20. While the law is free to promote all sorts of conduct in place of harmful behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government.

Far from supporting GLIB, then, *Turner Broadcasting* points to the reasons why the present application of the Massachusetts law can not be sustained. So do the two other principal authorities GLIB has cited. In *PruneYard Shopping Center* v. *Robins, supra,* to be sure, we

sustained a state law requiring the proprietors of shopping malls to allow visitors to solicit signatures on political petitions without a showing that the shopping mall owners would otherwise prevent the beneficiaries of the law from reaching an audience. But we found in that case that the proprietors were running "a business establishment that is open to the public to come and go as they please," that the solicitations would "not likely be identified with those of the owner," and that the proprietors could "expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand." 447 U. S., at 87. Also, in *Pacific Gas & Electric, supra,* at 12, we noted that *PruneYard* did not involve "any concern that access to this area might affect the shopping center owner's exercise of his own right to speak: the owner did not even allege that he objected to the content of the pamphlets . . . ." The principle of speaker's autonomy was simply not threatened in that case.

*New York State Club Assn.* is also instructive by the contrast it provides. There, we turned back a facial challenge to a state antidiscrimination statute on the assumption that the expressive associational character of a dining club with over 400 members could be sufficiently attenuated to permit application of the law even to such a private organization, but we also recognized that the State did not prohibit exclusion of those whose views were at odds with positions espoused by the general club memberships. 487 U. S., at 13; see also *Roberts,* 468 U. S., at 627. In other words, although the association provided public benefits to which a State could ensure equal access, it was also engaged in expressive activity; compelled access to the benefit, which was upheld, did not trespass on the organization's message itself. If we were to analyze this case strictly along those lines, GLIB would lose. Assuming the parade to be large enough and a source of benefits (apart from its expression) that would generally justify a mandated access provision, GLIB could

nonetheless be refused admission as an expressive contingent with its own message just as readily as a private club could exclude an applicant whose manifest views were at odds with a position taken by the club's existing members.

## IV

Our holding today rests not on any particular view about the Council's message but on the Nation's commitment to protect freedom of speech. Disapproval of a private speaker's statement does not legitimize use of the Commonwealth's power to compel the speaker to alter the message by including one more acceptable to others. Accordingly, the judgment of the Supreme Judicial Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*