05- 1732- cv
Burt v. Rumsfeld

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2006

(Argued: March 6, 2007)                    Decided: September 17, 2007)

Docket No. 05-1732-cv

————————

ROBERT A. BURT, faculty member Yale Law School; OWEN M. FISS, faculty member Yale
Law School, HAROLD HONGJU KOH, faculty member Yale Law School; KENJI YOSHINO,
faculty member Yale Law School; BRUCE ACKERMAN, faculty member Yale Law School;
ANNE L. ALSTOTT, faculty member Yale Law School; IAN AYRES, faculty member Yale
Law School; JACK M. BALKIN, faculty member Yale Law School; YOCHAI BENKLER,
faculty member Yale Law School; RICHARD R.W. BROOKS, faculty member Yale Law
School; AMY L. CHUA, faculty member Yale Law School; MORRIS L. COHEN, faculty
member Yale Law School; DENNIS E. CURTIS, faculty member Yale Law School; HARLON
L. DALTON, faculty member Yale Law School; DREW S. DAYS III, faculty member Yale Law
School; BRETT DIGNAM, faculty member Yale Law School; STEVEN B. DUKES, faculty
member Yale Law School; WILLIAM N. ESKRIDGE, Jr., faculty member Yale Law School;
DANIEL C. ESTY, faculty member Yale Law School; DANIEL J. FREED, faculty member Yale
Law School; ROBERT W. GORDON, faculty member Yale Law School; MICHAEL J.
GRAETZ, faculty member Yale Law School; OONA A. HATHAWAY, faculty member Yale
Law School; DAN M. KAHAN, faculty member Yale Law School; PETER W. KAHAN, faculty
member Yale Law School; JAY KATZ, faculty member Yale Law School; S. BLAIR
KAUFFMAN, faculty member Yale Law School; ALVIN K. KLEVORICK, faculty member
Yale Law School; ANTHONY T. KRONMAN, faculty member Yale Law School; CARROLL
L. LUCHT, faculty member Yale Law School; DANIEL MARKOVITS, faculty member Yale
Law School, JERRY L. MASHAW, faculty member Yale Law School; JEAN KOH PETERS,
faculty member Yale Law School; ROBERT C. POST, faculty member Yale Law School; J.L.
POTTENGER, Jr., faculty member Yale Law School; JUDITH RESNIK, faculty member Yale
Law School; CAROL M. ROSE, Faculty member Yale Law School, SUSAN ROSE-
ACKERMAN, Faculty member Yale Law School; JED RUBENFELD, Faculty member Yale
Law School; VICKI SCHULTZ, faculty member Yale Law School; REVA SIEGEL, faculty
member Yale Law School; ROBERT A. SOLOMON, faculty member Yale Law School;

STANTON WHEELER, faculty member Yale Law School; CONVERVATOR STEPHEN WIZNER, faculty member Yale Law School; JOHN G. SIMON, faculty member Yale Law School; MICHAEL J. WISHNIE, faculty member Yale Law School,[*]

Plaintiffs-Appellees,

-v-

ROBERT M. GATES, U.S. Secretary of Defense,[**]

Defendant-Appellant.

---

Before:  POOLER and RAGGI, <u>Circuit Judges</u>.[***]

---

The Solomon Amendment, 10 U.S.C. § 983(b), denies certain federal funding to a college or university if any part of the college or university refuses military recruiters equal access to its students and campuses.  The United States District Court for the District of Connecticut (Janet C. Hall, <u>Judge</u>) held that the Solomon Amendment violated the First Amendment rights of plaintiffs, who are faculty members at Yale Law School.  The Secretary of Defense appealed, and while his appeal was pending, the Supreme Court held that the Solomon Amendment does not violate the First Amendment.  <u>See</u> <u>Rumsfeld v. Forum for Academic and Institutional Rights,</u>

---

[*] The Clerk is directed to amend the official caption to conform with the plaintiffs as listed herein.

[**] Secretary of Defense Gates is substituted for his predecessor, former Secretary of Defense Donald H. Rumsfeld, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

[***] The Honorable Colleen McMahon, United States District Judge for the Southern District of New York, who was originally a member of this panel, recused herself following oral argument.   The remaining two members of the panel who are in agreement decide this case pursuant to Section 0.14(b) of the Local Rules of the United States Court of Appeals for the Second Circuit.

Inc., 547 U.S. 47, 126 S. Ct. 1297 (2006).

REVERSED and REMANDED.

————————

PAUL M. DODYK, New York, NY (Daniel Slifkin, Stephen E. Frank, and Gabriel F. Soledad, Cravath, Swaine & Moore, LLP, New York, NY, and David N. Rosen, David Rosen & Associates, P.C., New Haven, CT, on the brief) for Plaintiffs-Appellees.

SCOTT R. McINTOSH, Attorney, Appellate Staff Civil Division, Department of Justice, Washington, DC (Peter D. Keisler, Assistant Attorney General, Kevin J. O'Connor, United States Attorney for the District of Connecticut, Douglas N. Letter, Attorney, Appellate Staff Civil Division, Department of Justice, on the brief), for Defendant-Appellant.

————————

POOLER, Circuit Judge:

Plaintiffs, who are all members of the Yale Law School faculty and who together comprise a voting majority of the faculty,[1] sued then Secretary of Defense Donald M. Rumsfeld (the "Secretary"), alleging that the Solomon Amendment, 10 U.S.C. § 983(b)—which denies certain federal funding to an academic institution if even one portion of the institution does not allow military recruiters access to its campus and students on the same terms offered to non-military employers—is unconstitutional. See 10 U.S.C. § 983(b), (d). The United States District Court for the District of Connecticut (Janet C. Hall, Judge) held that the Solomon Amendment violated plaintiffs' First Amendment rights of freedom of speech and association. Burt v. Rumsfeld, 354 F. Supp. 2d. 156 (D. Ct. 2005). After the Secretary filed his appeal but before the

----

[1] According to the Yale University Faculty Handbook, the faculty of each school within the University has the authority to set educational policies within its school. Plaintiffs are thus coextensive with the law school itself with regard to the issues in this case.

3

appeal was perfected, the Supreme Court held in <u>Rumsfeld v. Forum for Academic and Institutional Rights, Inc.</u>, 126 S. Ct. 1297 (2006) ("<u>FAIR II</u>"), that the Solomon Amendment does not violate the First Amendment. Plaintiffs contend that <u>FAIR II</u> does not require reversal of the District Court's judgment because the Supreme Court did not consider whether the Solomon Amendment violates the First Amendment right to academic freedom. We conclude that the Supreme Court almost certainly rejected an academic-freedom argument made both by the plaintiffs in <u>FAIR II</u> and the current plaintiffs as amici, but that, in any event, plaintiffs' academic-freedom argument lacks merit. Therefore, we must reverse the District Court's judgment.

## BACKGROUND

Because the military is required to bar openly homosexual individuals from service, <u>see</u> 10 U.S.C. § 654, the Solomon Amendment caused conflict with the anti-discrimination policies of Yale Law School and many other academic institutions. Yale Law School requires any employer seeking the assistance of its career development office to sign a pledge not to discriminate on several bases, which include sexual orientation. The military has not been willing to sign this pledge. Therefore, for many years, the law school prohibited the military from participating in its two yearly interview programs.[2]

During the spring of 2002, Colonel Clyde J. Tate III, sent the president of Yale University a letter suggesting that Yale University would lose significant federal funding unless the law

---

[2] The law school did allow military recruiters alternative access to their students and to campus, which the military originally found satisfactory but later determined was not adequate. <u>See</u> <u>Burt</u>, 354 F. Supp. 2d at 168. We assume the reader's familiarity with the District Court's opinion, which describes the background of this litigation in detail.

4

school exempted the military from its non-discrimination policy.[3] On September 4, 2002, the law school faculty voted to authorize the dean to temporarily exempt military recruiters from its non-discrimination policy.

A year later, plaintiffs sued, alleging that (1) the Solomon Amendment violates their First Amendment rights of freedom of speech and association and (2) the Solomon Amendment violates their Fifth Amendment right to protect the special relationship between students and faculty. After some preliminary procedural skirmishing, plaintiffs moved for summary judgment, and the District Court granted their motion.

The District Court held that the Solomon Amendment unconstitutionally conditions federal funding on the surrender of plaintiffs' rights of freedom of speech and association. See Burt, 354 F. Supp. 2d at 174-87. While the court did not address academic freedom as a separate basis for finding a First Amendment violation, it did note that the deference traditionally given to speech in the academic setting made the protection of expressive association in the academy particularly appropriate. See Burt, 354 F. Supp. 2d at 186 n.29. However, the District Court rejected what it characterized as plaintiffs' "Fifth Amendment/Educational Autonomy Claim." Id. at 187-89.

The Secretary appealed. While the appeal was pending, the Supreme Court granted

---

[3]  The Solomon Amendment denies relevant federal funding to an academic institutions if any subelement of that institution has a policy or practice that prevents the military or Department of Homeland Security "from gaining access to campuses, or access to students . . . on campuses, for purposes of military recruiting in a manner that is at least equal in quality and scope to the access to campuses and to students that is provided to any other employer." 10 U.S.C. § 983(b). The affirmative requirement of equal access was added in 2004; previous versions had provided a regulatory "safe harbor" to academic institutions that provided equal access. See Burt, 354 F. Supp. 2d at168.

certiorari in Forum for Academic and Institutional Rights v. Rumsfeld, 390 F.3d 219 (3d Cir. 2004) ("FAIR I"), cert. granted, 544 U.S. 1017 (2005). As a result, we stayed this appeal pending the Supreme Court's decision.

On March 6, 2006, the Supreme Court issued a unanimous decision,[4] FAIR II, in which it upheld the constitutionality of the Solomon Amendment. Underlying the Court's ultimate holding were the following subsidiary holdings: (1) Congress's power "to 'provide for the common Defence,' '[t]o raise and support Armies,' and '[t]o provide and maintain a Navy'" is sufficiently broad to allow it to "to require campus access for military recruiters" "unless Congress exceeds constitutional limitations on its power in enacting such legislation." 126 S. Ct. at 1306 (quoting U.S. Const. art. I, § 8, cls. 1, 12-13); (2) judicial deference to Congressional powers is at its highest point when Congress legislates under its authority to raise and support armies and to provide and maintain a Navy, id.; and (3) it was unnecessary to consider whether the Solomon Amendment places an unconstitutional condition on funding to universities because the First Amendment would not bar Congress from directly requiring universities to grant access to military recruiters, see id. at 1307.

In explaining why commanding educational institutions to admit military recruiters would not violate the First Amendment, the Court first held that, "[a]s a general matter, the Solomon Amendment regulates conduct, not speech. It affects what law schools must do—afford equal access to military recruiters—not what they may or may not say." Id. While conceding that affording recruiting assistance implicates some speech-related activities such as notifying students of when army recruiters would be on campus, the Court held that these activities are

---

[4] Justice Alito did not take part.

"plainly incidental to the Solomon Amendment's regulation of conduct." Id. at 1308.

The Court then acknowledged that in certain cases—e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557 (1995), Pacific Gas & Electric Company v. Public Utilities Commission of California, 475 U.S. 1 (1986), and Miami Herald Publishing Company v. Tornillo, 418 U.S. 241 (1974)—it had found a First Amendment violation in the requirement that one speaker "host or accommodate another speaker's message." Id. at 1309.  Each of these decisions, the Court explained, "resulted from the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." FAIR II at 1309.  In contrast, the Court held, "accommodating the military's message does not affect the law schools' speech, because the schools are not speaking when they host interviews and recruiting receptions." Id.  The Court, therefore, rejected plaintiffs' claim that the Solomon Amendment impermissibly regulates speech.

The Court next examined whether the expressive nature of the regulated conduct gave it First Amendment protection.  It held that, "[u]nlike flag burning, the conduct regulated by the Solomon Amendment is not inherently expressive" and  therefore is not protected by the First Amendment. Id. at 1310-11 (distinguishing Texas v. Johnson, 491 U.S. 397, 406 (1989)).  Even assuming that plaintiffs' conduct were inherently expressive, the Court held that no First Amendment violation would result under the balancing analysis described in United States v. O'Brien, 391 U.S. 367, 377 (1968), see  United States v. Albertini, 472 U.S. 675, 689 (1985), for expressive conduct.  FAIR II, 126 S. Ct. at 1311.  Because the Solomon Amendment is a "neutral regulation" and "promotes a substantial government interest that would be achieved less effectively absent the regulation," the Court held that even if the Solomon Amendment regulated

7

expressive conduct, which it does not, it would be constitutional. Id.

The Court also held that the Solomon Amendment did not violate the plaintiffs' right of expressive association because "recruiters are not part of the law school" but rather "outsiders who come onto campus for the limited purpose of trying to hire students—not to become members of the school's expressive association." Id. at 1312. Further, the Court reasoned, "[s]tudents and faculty are free to associate to voice their disapproval of the military's message; nothing about the statute affects the composition of the group by making group membership less desirable." Id. at 1313.

The Court summed up:

In this case, FAIR has attempted to stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect. The law schools object to having to treat military recruiters like other recruiters, but that regulation of conduct does not violate the First Amendment. To the extent that the Solomon Amendment incidentally affects expression, the law schools' efforts to cast themselves as just like the schoolchildren in [West Virginia State Board of Education v.] Barnette[, 319 U.S. 624 (1943)], the parade organizers in Hurley, and the Boy Scouts in [Boy Scouts of America v.] Dale[, 530 U.S. 640 (2000)] plainly overstates the expressive nature of their activity and the impact of the Solomon Amendment on it, while exaggerating the reach of our First Amendment precedents.

Id.

One month after the Supreme Court issued FAIR II, the Secretary moved for summary reversal of the District Court judgment. Plaintiffs cross-moved for a remand to District Court. We summarily denied both motions.

On appeal, the government argues that FAIR II requires reversal of the District Court's judgment and vacatur of its injunction against enforcing the Solomon Amendment. First, the

government points out, the Supreme Court expressly rejected the actual underpinnings of the District Court's decision—that the Solomon Amendment compelled speech or violated the plaintiffs' right of expressive association. Second, although the Secretary concedes that FAIR II "does not discuss academic freedom in so many words," appellant's brief at 20, he argues that the Court implicitly rejected academic freedom as a basis for invalidating the Solomon Amendment because (1) the Third Circuit "expressly invok[ed] principles of academic freedom as a complement to the First Amendment's protection for freedom of expressive association," and (2) on appeal to the Supreme Court, both the FAIR plaintiffs and the plaintiffs in this lawsuit as amici in FAIR II argued that the Solomon Amendment interfered with academic freedom, id. at 21-22. Relying on a collateral estoppel case,[5] Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109-11 (2d Cir. 2002), the government contends that because the academic-freedom claim was necessarily resolved by FAIR II, it is not important that the Court did not expressly discuss academic freedom. Alternatively, the government argues that the academic freedom argument lacks merit.

Plaintiffs argue that the District Court's judgment survives because (1) FAIR II does not reach the issue of academic freedom; (2) the record demonstrates that the Solomon Amendment infringed on plaintiffs' right to academic freedom; and (3) the District Court's finding that the government failed to justify its intrusion on plaintiffs' rights by showing that the Solomon Amendment is narrowly tailored to serve a compelling interest is intact. Because of the

---

[5] Of course, the guiding principle here is not collateral estoppel as plaintiffs were not parties to the FAIR II litigation or in privity with these parties. Instead, we must attempt to discern what the Supreme Court actually held because its holdings bind us and all litigants in the federal courts.

9

extensive record, plaintiffs assume that we can find an academic freedom violation and then sustain the judgment in their favor based on the District Court's unchallenged finding of insufficient justification. Alternatively, the plaintiffs request that we remand to the District Court for consideration of the impact of FAIR II.

## DISCUSSION

The District Court already has rejected plaintiffs' academic freedom claim insofar as they urge it under a Fifth Amendment/substantive-due-process rubric. Burt, 354 F. Supp. 2d at 189. Because plaintiffs do not argue that the District Court erred in this holding, we are left with plaintiffs' claim that they have a First Amendment right to academic freedom that is not coterminous with the claims of freedom of speech and association that were rejected by the Supreme Court.

The Secretary does not controvert plaintiffs' defense of the District Court's finding that the Solomon Amendment is not narrowly tailored to serve a compelling governmental interest, but he does argue that in light of FAIR II, he is not required to establish narrow tailoring. We agree. Only if plaintiffs can establish that it is possible to carve out an exception from FAIR II for academic freedom claims does the finding of insufficient justification for the Solomon Amendment become relevant. Thus, the two issues immediately presented to this court are: (1) Does FAIR II compel reversal of the District Court judgment? and (2) If not, do plaintiffs have a viable academic freedom claim?[6]

_____

[6] Plaintiffs also argue that the District Court, unlike the Supreme Court, had before it a voluminous factual record demonstrating that Yale Law School chose its non-discrimination policy for educational reasons and that it was an essential part of the Yale Law School academic environment. The government contends that there is no fundamental difference between the two

(continued...)

10

**I. The impact of FAIR II.**

The government argues that FAIR II conclusively determines the issue of academic freedom because (1) the FAIR I decision rested, in part, on notions of academic freedom, and the court could not have reversed without also rejecting the academic-freedom reasoning, and (2) the FAIR II plaintiffs, as well as these plaintiffs as amici, relied on academic freedom in arguing for affirmance. The government relies on a footnote in FAIR I to support its contention that one of the Third Circuit's reasons for invalidating the Solomon Amendment was academic freedom. That footnote, however, merely states: "[T]he law schools are entitled to at least as much deference as the Boy Scouts [in Dale], as the Supreme Court has recognized in other contexts that universities and law schools occupy a special niche in our constitutional tradition."[7] FAIR I, 390 F.3d at 233 n.13 (internal quotation marks omitted). The Third Circuit went on in that footnote to discuss some of the Supreme Court's leading academic freedom cases and stated that the Court's "academic freedom jurisprudence . . . underscores the importance of Dale deference in our case." Id. Thus, although the Third Circuit viewed academic freedom as adding weight to the FAIR plaintiffs' expressive association claim, academic freedom was not itself necessary to its holding that Dale deference was appropriate. Indeed, FAIR I did not hold that academic freedom altered the normal First Amendment analysis. Therefore, it would be inaccurate to assume based on FAIR I, that the FAIR II court necessarily considered and rejected an argument

---

[6](...continued)
records. We need not resolve this dispute because even assuming that plaintiffs correctly describe the differences between the records, we can resolve the academic-freedom claim as a matter of law.

[7] In Dale, The Supreme Court instructed that judges must "give deference to an association's view of what would impair its expression." Dale, 530 U.S. at 653.

that academics have a heightened First Amendment right in speech or association or a First Amendment academic-freedom right that is not subsumed in the freedoms of speech or association.

However, both the FAIR plaintiffs and the Burt plaintiffs acting as amici did argue to the Supreme Court that principles of academic freedom required invalidation of the Solomon Amendment. See Brief for Respondents at 28-30, FAIR II, No. 04-1152 (available at 2005 WL 2347175); Brief for Robert A. Burt et al. as Amici Curiae Supporting Respondents, at 2, 10-13, FAIR II, No. 04-1152 (available at 2005 WL 2347172). The presence and extent of this briefing strongly suggest that in FAIR II, the Court considered and rejected an academic freedom claim under the rubric of the First Amendment rights of free speech and association. Further, the Court summed up by saying that plaintiffs had "attempted to stretch a number of First Amendment doctrines well beyond the sort of activities these doctrines protect." FAIR II, 126 S. Ct. at 1313. Finally, it would defy reason to assume that the Supreme Court ignored plaintiffs' status as academics in rejecting their First Amendment arguments. Because the parties and amici squarely argued academic freedom and the Court concluded that all of plaintiffs' First Amendment arguments lack merit, it is much more likely than not that the Supreme Court rejected the FAIR plaintiffs' academic-freedom argument, thus precluding us from accepting the same argument.

**II. Merits.**

Even if the Supreme Court did not reject the FAIR plaintiffs' academic-freedom argument, we would reject it based on the merits. Their argument has two prongs, the second of which, as we will discuss later, is squarely precluded by FAIR II. First, plaintiffs contend that because excluding employers that engage in invidious discrimination is crucial to their

12

educational mission of inculcating a commitment to equal justice among their students, ensuring

a diverse student body, and helping student's find appropriate careers, traditional academic

freedom concepts prohibit the government from enforcing the Solomon Amendment against

them. Second, they analogize refusing to allow the military equal access to their students to the

sorts of boycotts protected under the First Amendment and argue that they have been denied their

right of disassociation.

The First Amendment guarantee of academic freedom rests on a recognition of "the vital

role in a democracy that is played by those who guide and train our youth." Sweezy v. New

Hampshire, 354 U.S. 234, 250(1957). As the Sweezy plurality explained:

> To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." Sweezy v. New Hampshire, 354 U.S. 234, 250 (1957) (plurality opinion).

Id. Thus, academic freedom can be implicated in a teacher's refusal to answer questions about

the content of his lectures, see id. at 254; in a teacher's refusal to certify that he is not a member

of an organization considered subversive, see Keyishian v. Board of Regents of the Univ. of

N.Y., 385 U.S. 589, 607-10 (1967); in a university's selection of a diverse student body, see

Regents of the University of Cal. v. Bakke, 438 U.S. 265, 311-12 (1978) (Powell, J.)[8]; Grutter v.

Bollinger, 539 U.S. 306, 328-29 (2003); and in the University's right to make its own rules

---

[8] This part of Justice Powell's opinion was not joined by any of the other justices; however, his approach was adopted by the court in Grutter, 539 U.S. at 328-29.

concerning academic standards and discharges, see Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225-26 & n.12 (1985); see also Sweezy, 354 U.S. at 263 (Frankfurter, J., concurring) (describing university's right to academic freedom as the right "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study").[9]

By imbuing certain core academic decisions with First Amendment protection, the Supreme Court's academic-freedom jurisprudence principally protects the "'marketplace of ideas'" in the university and prevents government intrusion that would otherwise "cast a pall of orthodoxy over the classroom." Keyishian, 385 U.S. at 603; see id. ("The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth out of a multitude of tongues, rather than through any kind of authoritative selection." (internal quotation marks and alterations omitted)); Sweezy, 354 U.S. at 250 (stressing the importance of free inquiry); Grutter, 539 U.S. at 329 (recognizing university interest in ensuring diverse student body as means to primary end of ensuring free flow of ideas). In this manner, the Court's jurisprudence grounds the academic freedom right in the "constitutional interest . . . [at] the heart of the First Amendment." Appellant's Reply Br. at 8; see West Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." (emphasis added)).

---

[9] Board of Regents of the University of Wisconsin System v. Southworth, 529 U.S. 217, 221 (2000), on which plaintiffs rely does not fall comfortably into the line of cases discussing academic freedom model addressed above. Rather, it addresses whether the First Amendment prevents a state university from imposing a student activity fee to fund various organization on students who may disagree with the speech and goals of those organizations.

The relationship between barring military recruiters and the free flow of ideas is much more attenuated. The Solomon Amendment places no restriction on the content of teaching, the membership of teachers in organizations, the selection of students, or evaluation and retention of students. While requiring universities to grant military recruiters that discriminate in hiring equal access to their campuses and students may incidentally detract from the academic mission of inculcating respect for equal rights, this requirement undermines educational autonomy in a much less direct and more speculative way than do the policies addressed in Sweezy, Keyishian, Grutter, and Ewing. Plaintiffs have identified no authority that suggests to us that the Supreme Court would extend its protection of academic freedom to denying equal access to military recruiters, a practice that it has already defined as conduct, see FAIR II, 126 S. Ct. at 1310. Such authority as exists convinces us that the Court would not extend its academic-freedom jurisprudence to the Solomon Amendment. See University of Pennsylvania v. EEOC, 493 U.S. 182, 199-200 (1990) (rejecting as too attenuated and speculative an academic-freedom challenge to an EEOC subpoena for peer review records after stating that the university claimed "that the First Amendment is infringed by disclosure of peer review materials because disclosure undermines the confidentiality which is central to the peer review process, and this in turn is central to the tenure process, which in turn is the means by which [the university] seeks to exercise its asserted academic-freedom right of choosing who will teach"). Plaintiffs' claim, too, is indirect and speculative, and we reject it.

Plaintiffs' second argument cannot stand on its own. In essence, plaintiffs claim that their academic-freedom claim is buttressed by the constitutional protection accorded to the means they use to protect their students from discrimination – a boycott. They argue that in boycotting the

recruiters, they are exercising a right of disassociation, which is reciprocal to the right of association.  While boycotts motivated by principle certainly enjoy a degree of constitutional protection, see  NAACP v. Claiborne Hardware Co., 458 U.S. 886, 907-15 (1982), the FAIR II Court already has rejected the argument that the Solomon Amendment forces the plaintiffs to associate with the military, see 126 S. Ct. at 1312.  Logically, then, the plaintiffs also remain free to disassociate themselves from the recruiters by words and deeds.   Plaintiffs, therefore, have no First Amendment claim that is not either lacking in merit or that has not already been rejected by the Supreme Court.

## CONCLUSION

For the reasons we have discussed, we reverse the judgment of the District Court and remand for vacatur of the injunction and entry of judgment in favor of defendant.