LIPEZ, Circuit Judge,
dissenting in part.
I agree with Judge Campbell’s excellent opinion in all but one respect. Because there is a world of difference between marching down the main street of a city and being confined to a sidewalk or park to communicate one’s message, I do not agree that the City’s parade ordinance complies with the First Amendment without an indigency exception. All citizens, not only those who can afford the cost of traffic control, have a right to express their views on matters of public concern in *46 the most powerful of our nation’s traditional public fora. See Murdock v. Pennsylvania, 319 U.S. 105, 111, 63 S.Ct. 870, 87 L.Ed. 1292 (1943) (“Freedom of speech ... [is] available to all, not merely to those who can pay their own way.”). Therefore, I respectfully dissent from that portion of the majority opinion allowing Augusta to impose parade permit fees without regard to an applicant’s ability to pay.
I.
A. Fundamental Rights and Indigents
The right to free speech embodied in the First Amendment is a fundamental constitutional guarantee, and access to public spaces to speak on matters of public concern has long been a concomitant privilege of the right of expression. The Supreme Court has recognized that use of the streets and other public places has
from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.... [S]treets and parks ... have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.
Hague v. CIO, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.); see also Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 579, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995) (“Having availed itself of the public thoroughfares ‘for purposes of assembly [and] communicating thoughts between citizens,’ the [petitioner] is engaged in a use of the streets that has ‘from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.’ ”) (quoting Hague, 307 U.S. at 515, 59 S.Ct. 954); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (noting that streets and parks are “[a]t one end of the spectrum” among “places which by long tradition or by government fíat have been devoted to assembly and debate”).
In this case, plaintiffs claim that their access to the “public streets, the quintessential traditional public fora,” Int’l Soc. for Krishna Consciousness v. Lee, 505 U.S. 672, 676, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (citation omitted), may not be denied based on their inability to pay the required fees. In many contexts, disparities attributable to wealth are not of constitutional significance. See Kadrmas v. Dickinson Pub. Schs., 487 U.S. 450, 458, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988) (“We have previously rejected the suggestion that statutes having different effects on the wealthy and the poor should on that account alone be subjected to strict equal protection scrutiny.”). Nevertheless, in multiple settings involving fundamental rights, the Supreme Court has held that it is unconstitutional to deny access to indigents. See, e.g., M.L.B. v. S.L.J., 519 U.S. 102, 114-16, 123-24 & n. 14, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (striking down Mississippi statute conditioning appeal of order terminating parental rights on advance payment of court fees and noting that “fee requirements ordinarily are examined only for rationality” but that exceptions have been made under equal protection principles when a “fundamental interest [is] at stake”); Lubin v. Panish, 415 U.S. 709, 718, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974) (“[I]n the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.”); Boddie v. Connecticut, 401 U.S. 371, 374, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) (relying on due process principles to hold that the State may not deny a divorce to a couple based on inabili *47 ty to pay court costs); Griffin v. Illinois, 351 U.S. 12, 17-19, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (relying on due process and equal protection principles to invalidate a state requirement that a defendant pay for a trial transcript as a prerequisite to appeal and holding that an indigent defendant has an equal right of access to appellate review of a conviction where a State generally affords such review); cf. Kadr-mas, 487 U.S. at 465, 108 S.Ct. 2481 (rejecting plaintiffs’ claimed entitlement to free school bus transportation because “the statute challenged in this case discriminates against no suspect class and interferes with no fundamental right”).
In concluding that some degree of public subsidy is necessary in these contexts, the Court relied on equal protection or due process principles, or both,[16] and applied heightened review because of the fundamental interests at stake. See M.L.B., 519 U.S. at 115-16, 117 S.Ct. 555 (noting that, “[ajbsent a fundamental interest or classification attracting heightened scrutiny, ... the applicable equal protection standard ‘is that of rational justification’ ”) (quoting Ortwein v. Schwab, 410 U.S. 656, 660, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) (per curiam)). Under such heightened review, “the State’s need for revenue to offset costs” was insufficient justification for denying equal access to individuals of limited economic means. See M.L.B., 519 U.S. at 123,117 S.Ct. 555.
The Court’s discussion in M.L.B. sheds fight on the nature of the rights triggering heightened scrutiny of government fees. There, the respondents had asserted that prior case law established that the government “ ‘need not provide funds so. that people can exercise even fundamental rights’ ” and argued that a subsidy for the M.L.B. parent would conflict with cases “recognizing that the Constitution ‘generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure fife, liberty, or property interests of which the government’ ” 519 U.S. at 124-25, 117 S.Ct. 555 (citation omitted).[17] In response, the Supreme Court distinguished the cited cases as involving efforts to obtain “state aid to subsidize their privately initiated action or to alleviate the consequences of differences in economic circumstances that existed apart from state action.” Id. at 125, 117 S.Ct. 555.
The plaintiffs here neither claim entitlement to benefits the state has made available in limited circumstances — such as tax breaks or Medicaid funding — nor otherwise invoke an “affirmative right” to governmental assistance to meet personal needs or private concerns. To the contrary, they invoke an explicit constitutional right to speak in a forum that the government holds in trust for just such a purpose. Their claim to this forum implicates core First Amendment values. The plaintiffs sought to speak on matters of public *48 concern relating to national and international affairs. “[T]he Court has frequently reaffirmed that speech on public issues occupies the ‘highest rung of the hierarchy of First Amendment values,’ and is entitled to special protection,” Connick v. Myers, 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (quoting NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980)). The First Amendment’s explicit right “peaceably to assemble” lends further weight to their interest in a public gathering to address common concerns. See, e.g., Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941) (noting that regulation of use of the streets implicates “the right of assembly and the opportunities for the communication of thought and the discussion of public questions”).
Moreover, public speech is not a self-centered pursuit; it is speech for “the public.” Any assumption that the speaker is the primary beneficiary when he uses a public forum is incorrect:
This assumption ignores the benefit of the speaker’s activities for the entire society. His activities are part of the process by which a democratic society makes informed decisions. He speaks so that society can listen and decide for itself.
David Goldberger, A Reconsideration of Cox v. New Hampshire: Can Demonstrators Be Required to Pay the Costs of Using America’s Public Forums?, 62 Tex. L.Rev. 403, 413 (1983) (hereinafter “Gold-berger”). An individual who seeks a permit to disseminate a message about matters of public concern in a traditional public forum is thus exerting free speech rights that not only are explicitly promised by the Constitution but also are of value to the community as a whole. Where such communal benefits exist, the government’s countervailing interest in recouping costs solely from the individual is weaker.
First Amendment rights are not absolute, however, and indigency does not alter that principle. As the majority explains, the government may impose reasonable time, place and manner restrictions on the exercise of First Amendment rights, “provided the restrictions ‘are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.’ ” Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)); see also City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (“[A] restriction on expressive activity may be invalid if the remaining modes of communication are inadequate.”); Globe Newspaper Co. v. Beacon Hill Architectural Comm’n, 100 F.3d 175, 186 (1st Cir.1996). I therefore must consider whether the fee requirement in the parade ordinance satisfies this three-part inquiry.
The first prong is easily met here. It is undisputed that Augusta’s parade ordinance is content neutral. On its face, the ordinance also is narrowly tailored to serve the government’s recognized interest in recovering the costs of administration, traffic-control and clean-up associated with parades held on public streets. See Forsyth County v. Nationalist Movement, 505 U.S. 123, 136, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) (“[Rjaising revenue for police services ... undoubtedly is an important government responsibility....”); Cox, 312 *49 U.S. at 576, 61 S.Ct. 762 (approving fees limited to administrative expenses and “ ‘to the maintenance of public order in the matter licensed’ ”) (quoting state court’s construction of the challenged statute). As discussed above, however, such fees are subject to heightened review in the context of First Amendment rights. See 519 U.S. at 115-16, 117 S.Ct. 555; Casey v. City of Newport, 308 F.3d 106, 110-11 (1st Cir.2002). They cannot survive such scrutiny if individuals unable to pay the fees would be denied an adequate public forum for speaking on issues of public importance — the concern addressed by prong three of the time, place and manner inquiry.
Plaintiffs’ claim that they are constitutionally entitled to a fee waiver thus turns on whether the City offers an adequate alternative to a street march for disseminating a message that concerns a public issue.[18] As I shall explain, I share the district court’s view that the options proffered by the City fall short of the constitutional standard. See Sullivan v. City of Augusta, 406 F.Supp.2d 92, 126 (D.Me.2005).[19]
B. The Adequacy of the Available Alternatives
In finding that Augusta offered plaintiffs no adequate alternatives to a street march, the district court concluded that the parade ordinance arguably embraced sidewalks as well as streets. I agree with the majority that the ordinance should not be read in that manner. The City’s past practice sufficiently demonstrates that the ordinance does not extend to sidewalks and that sidewalks are thus an available free alternative to the streets, along with parks and the Statehouse steps. The question thus becomes whether streets provide such a unique forum for the communication of views that other public fora, including sidewalks, cannot be deemed adequate alternatives.
That assessment necessarily requires an examination of the speaker’s objectives— both in terms of the message she wishes to communicate and the audience she seeks to reach. Still, the match between the desired forum and a substitute need not be perfect: “ ‘[T]he lens of inquiry must focus not on whether a degree of curtailment exists, but on whether the remaining communicative avenues are adequate.’ ” Globe Newspaper, 100 F.3d at 193 (quoting Nat’l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 745 (1st Cir.1995)).
In assessing adequacy, we have been particularly sensitive to the ability of a party to disseminate its message to the same general audience despite the restrictions at issue. In Globe Newspaper, we considered the validity of a ban on news-racks in the Beacon Hill Historical District of Boston. 100 F.3d at 178. We noted that the regulation did not prevent the plaintiff newspapers from selling their publications in the District by means of *50 street vendors, thereby accomplishing them objective “in the very public forum-— the District’s sidewalks — from which the newsracks are banned.” 100 F.3d at 193.
The Supreme Court reached a similar conclusion in City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984), which involved a challenge to an ordinance banning all posted signs, including political campaign posters, in the City of Los Ange-les. The Court found that the ban did “not affect any individual’s freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs ... is prohibited.” Id. at 812, 104 S.Ct. 2118. Similarly, in National Amusements, we upheld a town bylaw prohibiting the showing of movies between 1 a.m. and 6 a.m. despite the appellant’s assertion that the regulation “foreclose[d] the opportunity to communicate its message to a distinct segment of the movie-going public” — those who would attend only a midnight showing. 43 F.3d at 745. Although we acknowledged that the bylaw would “diminish[] the total quantity of appellant’s speech in some measure, and simultaneously curtail[ ] its opportunity to communicate” with patrons who preferred midnight shows, we concluded that “thwarting such an idiosyncratic preference cannot be equated with a denial of adequate avenues of communication.” Id. In each of these cases, while some potential recipients of the message may have been missed, the message could still reach the intended audience.
In this ease, plaintiff Sullivan sought a parade permit in February 2004 on behalf of a group known as the March for Truth Coalition, which advocates the “worldwide end of war and empire-building” as well as social and economic reform. Plaintiff Dan-singer sought a permit to hold a peace march and rally in conjunction with the Million Worker March to be held in Washington, D.C., in October 2004.[20] Both proposed parades were thus aimed at shaping public attitudes about matters of public policy-the type of political speech that long has been associated with street marches.
Of the available free alternatives, it is easy to conclude that parks and similar fixed sites where speakers may congregate are not adequate alternative locations for achieving the objectives of street marches. A stationary gathering whose message will be delivered to only the finite group of non-participants who also happen to be in that spot or travel by it is considerably different from a march that inevitably will come into contact with waves of outsiders. A march down Main Street will display the message to pedestrians, business owners, customers, and even motorists who encounter the periphery of the procession while being re-routed. Although television and newspaper coverage could enlarge the audience for a stationary protest, that possibility depends on the editorial judgments of the media, and any message actually disseminated would be both limited in scope and lacking the immediacy of personal contact. If plaintiffs’ objective had been to demand that state legislators take particular action on pending legislation,
*51 the City’s assertion that the Statehouse steps were an adequate alternative would have more force. Plaintiffs, however, sought to persuade as many members of the public as they could reach to join their efforts to advocate for changes in public policy.
In finding that the City could not constitutionally “block indigents from using the public streets to convey their message,” the district court relied on the opinion of plaintiffs’ expert, Joe H. Bandy, III, a sociology professor at Bowdoin College with a special expertise in the study of social movements. See Sullivan, 406 F.Supp.2d at 124-25. Professor Bandy confirmed the superiority of “moving speech” for communicating a political message:
With a march that moves through public streets, the demonstrators can bring their protest message to a variety of different audiences, audiences that are not a part of the activists’ direct constituency but the broader public.... [B]y protesting through a format that moves through different public spaces, a march is more likely to gain the attention of the media and political leaders than if the demonstration were localized in one area that did not inconvenience the general public in some way.
Bandy Declaration, 1/20/05, at 3, App. at 111.
While large gatherings in public places can sometimes attract similar attention, the force of a message conveyed by the more typical small protest group will be much greater if the group is marching down the city’s main thoroughfares, displacing other people’s daily routines, than if it is confined to a park or the Statehouse steps. See Gary Wiseman, Note, Paying for Free Speech: The Continuing Validity of Cox v. New Hampshire, 64 Wash. U.L.Q. 985, 988 n. 16 (1986) (hereinafter “Wiseman”) (“In the absence of spectators, even the most exciting demonstration lacks force.”). Therefore, when a speaker seeks to motivate the general public about a matter of public policy, the opportunity to communicate from a fixed location will rarely be an adequate substitute for a march down city streets.
Sidewalks, however, present a closer question. Like the street march, a sidewalk march provides access to a constantly changing audience that will likely include many of the same individuals who would observe a procession moving down the middle of the street. Although the City notes that a sidewalk procession would be viewed by more motorists than a street march because the streets would be open and cars would be able to travel directly past the procession, that theoretical advantage is illusory. Such motorists will of necessity be focused on traffic conditions and will be unable to give other than incidental attention to the parade.[21]
Moreover, it is not only the size of the crowd on the sidelines that affects the message being conveyed. If a march is confined to the sidewalks, the perception that space is limited, and that fewer marchers can therefore be accommodated, will reduce the number of participants. The district court reasonably accepted ap-pellees’ assertion that safety concerns “may deter some would-be participants” from joining a sidewalk march because of the need to cross traffic and the lesser police presence. Sullivan, 406 F.Supp.2d at 125. Indeed, such concerns are likely to *52 suppress the number of spectators as well, with shoppers and others altering their routes to avoid the sidewalk congestion. The resulting reduction in the number of marchers, as well as spectators, dilutes the message that is delivered:
[B]y reducing the number of participants or spectators, a speaker forfeits other advantages of size. A mass demonstration “conveys an image of power to bystanders and participants alike, reinforces the group’s commitment to its cause, ... and appears to circumvent the elite’s power to control mass communication.”
Wiseman, 64 Wash. U.L.Q. at 988 n. 16 (quoting Stanley Ingber, The Marketplace of Ideas: A Legitimizing Myth, 1984 Duke L.J. 1, 41 n. 7); see also Eric Neisser, Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas, 74 Geo. L.J. 257, 297 (1985) (hereinafter “Neisser”) (“[T]hose who hold unpopular, unknown, or unrepresented views can express the strength of their position (when allowed in the public marketplace of ideas) only through their numbers.”).
Street marches have the distinct advantage of allowing more participants to march side-by-side, giving the demonstration — and its message — a more commanding presence. Professor Bandy observed that the narrowness of sidewalks can affect both the logistics of a march and the strength of the message: “[A]s a matter of logistics, having a large number of people file in a very narrow pathway would make a more snake-like procession rather than a mass rally procession. This narrowing of the demonstration would likely dampen the message because the demonstration would not look as large to passers by or the media.” See Bandy Declaration at 5, App. at 113.
The large signs and banners we have come to expect as part of a parade cannot be displayed across the narrower width of a sidewalk, and the logistical difficulty of carrying such oversized messages front-to-back along the edge of the sidewalk undoubtedly would discourage their use. No matter how long the procession, a small band of protesters carrying small signs simply does not communicate the same dramatic image of massive support as a crowd walking six or eight abreast carrying street-wide signs. Thus, excluding speakers from the streets does not simply relocate their message. The strength of the message is measurably diminished by the perception that it lacks support from the “masses.” See Bandy Declaration at 5, App. at 113.[22]
While the numbers — both real and perceived — are important, they are not the only relevant factor. The tradition of a parade as a public event means that a street march commands our attention in a way that a sidewalk procession does not. As a community, we look forward to parades, we are attentive to them, and we interrupt our everyday lives to accommodate them. A parade is a significant community event — whether its purpose is to recognize Irish heritage on St. Patrick’s Day, to celebrate a sports championship, or to express gratitude to soldiers on Veterans Day. A marcher confined to the sidewalk is thus denied the public forum that we historically have used to express our collective sentiment. See Timothy Zick, Space, Place, and Speech: The Expressive Topography, 74 Geo. Wash. L.Rev. 439, 460 (2006) (hereinafter “Zick”) (“In terms *53 of communicative behavior, place is as critical to expressive experience as voice, sight, and auditory function.”).
Moreover, in recent decades, streets have acquired powerful symbolism as a forum for protest and political expression. The images of 1960s civil rights activists marching through the streets remain vivid, and those marches continue to inspire the current generation of street protests on matters of global importance — including racial injustice, war and peace, and the inattentiveness of a community to its poor. See, e.g., Iraq Vets Lead Syracuse March, People’s Weekly World, Oct. 11, 2007 (describing September 2007 march through streets of Syracuse, N.Y., by more than 2,500 peace activists, including members of Fort Drum chapter of Iraq Veterans Against the War); Rallies Support Jena Teens, San Jose Mercury News, Sept. 21, 2007 (from New York Times news service) (describing a “slow-moving march that filled streets, spilled onto sidewalks and stretched for miles,” with more than 10,000 demonstrators, protesting the treatment of six black Louisiana teenagers arrested in the beating of a white classmate); Janitors to March for Pay Increases, San Ma-teo County Times, June 14, 2007 (describing planned street march by “[tjhousands of Silicon Valley janitors” from East Palo Alto to “the heart of Palo Alto’s affluent downtown” as part of International Justice for Janitors Day); Demonstrators to Turn Out for Immigration Reform, Denver Rocky Mountain News, May 1, 2007 (reporting that “Denver and other cities across the nation will host another round of marches today to demonstrate that the campaign for immigration reform is still under way”). Indeed, “taking it to the streets” is itself part of the activist message, i.e., that ordinary people have the power to take over the public way in their pursuit of social change. See Zick, 74 Geo. Wash. L.Rev. at 471 (“Parades, protests, and demonstrations are ... akin to temporary appropriations of the streets. They express specific social and political messages and give public voice to sentiments about existing power relations.”).
Sidewalk protests, by contrast, are commonly associated with more particularized dissent. A sidewalk demonstration is often linked to a specific business or institution, focusing attention on what is occurring at that moment at that place-targeting, for example, a business that refuses to serve or hire members of minority groups, an abortion clinic, or an employer engaged in a labor dispute.
There are exceptions, of course. As the City points out, the civil rights movement used sidewalk marches on multiple occasions during the 1960s. The successful Selma-to-Montgomery voting rights march along Highway 80 in late March 1965 could not have been more powerful if the thousands of marchers had been walking down the middle of the road. Although such marches had enormous impact during an extraordinary time in our country’s history, when equal rights demonstrators had widespread support and the world’s attention, the fact remains that a sidewalk march is usually an inadequate substitute for the streets when the message to be disseminated is unrelated to a specific locale.
The stakes in access to the free public forum have also become higher as other methods for reaching mass audiences have grown more expensive and out of reach for the average citizen.
[A]ll speakers cannot gain access to all forums. For example, many speakers cannot afford television or radio broadcasting time, and speakers espousing unconventional views may find the mass media unreceptive. For this reason, public streets and parks, which are ac *54 cessible to speakers regardless of their financial resources or media appeal, are vitally important public forums. Maintaining free access to public streets and parks helps insure a market composed of a wide range of competing ideas.
Wiseman, 64 Wash. U.L.Q. at 986 (footnotes omitted); see also Santa Monica Food Not Bombs v. Santa Monica, 450 F.3d 1022, 1036 (9th Cir.2006) (“As traditional public fora, parks, sidewalks, and streets ‘provide a free forum for those who cannot afford newspaper advertisements, television infomercials, or billboards.’ Those fora must not be regulated too restrictively, lest they become unavailable to those who have little or no recourse to other, often costly, areas for public discourse.”) (citation omitted); Bandy Declaration at 7, App. at 115 (“[S]ocial movements have none or very few alternative methods to communicate their message other than low-cost demonstrations in public spaces and streets.”); Neisser, 74 Geo. L.J. at 297.[23]
Although the internet has provided new fora for communicating with large numbers of people, websites, blogs and other publicly accessible online opportunities are not substitutes for the face-to-face experiences that have, “from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.” See Menotti v. Seattle, 409 F.3d 1113, 1174 (9th Cir.2005) (Paez, J., concurring in part and dissenting in part) (“‘[T]here is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person.... ’ Public protests are at the heart of the First Amendment and are critical for incubating civic engagement and encouraging spirited debate.”) (quoting Hodgkins v. Peterson, 355 F.3d 1048, 1063 (7th Cir.2004)); Thomas P. Crocker, Displacing Dissent: The Role of ‘Place’ in First Amendment Jurisprudence, 75 Fordham L.Rev. 2587, 2590 (2007) (“[T]he Internet does not provide for serendipitous occasions to encounter others face-to-face or to discover the new or the strange in both a social and public setting.”); Zick, 74 Geo. Wash. L.Rev. at 484 (“There is no question that an abundance of speech takes place in these new places; but courts must recognize that this speech is qualitatively and, quite often, quantitatively different from speech in real places.”). The streets thus remain the only publicly accessible forum that offers speakers both the immediacy of personal contact and — in contrast to sidewalks — the realistic potential for attracting a large audience and widespread attention with a powerful message undiluted by space constraints.
To be sure, the Constitution does not guarantee every speaker her forum of choice. See, e.g., Heffron v. Int'l Soc. for Krishna Consciousness, 452 U.S. 640, 647, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (“It is [ ] common ground ... that the First Amendment does not guarantee the right to communicate one’s views at all times and places or in any manner that may be desired.”). As noted earlier, an alternative need not have precisely the same impact to be “ample,” see Taxpayers for Vincent, 466 *55 U.S. at 812, 104 S.Ct. 2118; Globe Newspaper, 100 F.3d at 193. However, under any meaningful standard of heightened review, that alternative forum cannot be ample if it lacks the qualities that make the streets a uniquely powerful forum for expression, and thereby leaves indigent speakers and the public they seek to influence with a substantially different and diminished First Amendment experience. In upholding the sign ordinance in Taxpayers for Vincent, the Court concluded that there was “no reason to believe” the expressive benefits of posting signs on public property could not be obtained through other means. 466 U.S. at 812, 104 S.Ct. 2118. Noting the absence of a traditional right of public access to utility poles for purposes of communication “comparable to that recognized for public streets and parks,” id. at 814, 104 S.Ct. 2118, the Court observed:
Notwithstanding appellees’ general assertions in their brief concerning the utility of political posters, nothing in the findings indicates that the posting of political posters on public property is a uniquely valuable or important mode of communication, or that appellees’ ability to communicate effectively is threatened by ever-increasing restrictions on expression.
Id. at 812, 104 S.Ct. 2118.
Here, by contrast, we are considering access to “ ‘[traditional public forum property,’ ” which “ ‘occupies a special position in terms of First Amendment protection,’ ” id. at 813, 104 S.Ct. 2118 (quoting United States v. Grace, 461 U.S. 171, 180, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983)). And, as I have described, the communication difference between the streets and sidewalks is substantial, despite their physical proximity. A speaker whose march may proceed down the middle of Main Street has numerous advantages — larger numbers of spectators and participants, the space to accommodate bolder and bigger signs, the focused attention drawn by a parade, and the symbolic power of “taking it to the streets.”
This case implicates what Taxpayers for Vincent did not: “a uniquely valuable or important mode of communication,” 466 U.S. at 812, 104 S.Ct. 2118, that has “immemorially been held in trust for the use of the public,” Hague, 307 U.S. at 515, 59 S.Ct. 954. Because a message communicated in the streets is uniquely powerful, a speaker in Augusta who is unable to pay the permit fee to hold a street march has no adequate alternative. That fee barrier is particularly unacceptable given the government’s role as trustee for the public in providing safe access for expressive and other uses of the streets. See Cox, 312 U.S. at 574, 61 S.Ct. 762. Consequently, the Constitution requires that the city’s parade ordinance include an indigency exception.
II.
The City maintains that providing a fee exception for indigents would be virtually impossible to administer. Without minimizing the challenges of designing and implementing such a system, there is experience to the contrary. Other cities have included indigency waiver provisions in their schemes, and have adopted various approaches for determining eligibility. In Pittsburgh, for example, a sponsor of a parade or other expressive event protected by the First Amendment will not be charged the application fee or any other costs — including for traffic control — upon a showing of indigency. To establish indi-gency, the event sponsor must submit a notarized affidavit certifying that:
(1) The costs to be imposed exceed the available resources of the sponsor/organization and the sponsor/organization *56 does not reasonably foresee such funds becoming available within a reasonable period after the Event; and
(2)The sponsor is not charging participation fees or other admittance fees to the general public for the Special Event and has no other sponsor that is underwriting costs.
Pittsburgh, Pa., Code of Ordinances § 470.06(d)(1), (2).[24] The Minneapolis ordinance sets a $25 parade permit fee and also requires applicants — without expense to the city — to
(1) ... provide either authorized civilian or police personnel at all intersections requiring traffic-control personnel.
(2) ... provide volunteers to monitor the barricades at all intersections not requiring traffic-control personnel, as determined by the department of public works and the police department.
(3) ... provide, install and remove the barricades, signs and delineation equipment as directed by either the director of public works or the chief of police or their designees.
(4) ... defend and hold the city harmless from all claims, demands, actions or causes of action, of whatsoever nature or character, arising out of or by reason of the conduct of the activity authorized by such permit, including attorney fees and expenses.
Minneapolis, Minn., Code of Ordinances § 447.120. However, the city provides an indigency exception “[f]or individuals and organizations with limited financial means” if “such burdens substantially threaten the ability of such individuals and organizations to obtain a parade permit.” § 447.150. The director of public works may waive the parade requirements under the following circumstances:
(1) All parade applications. The parade applicant and each person responsible for organizing the parade must certify that each: (1) receives public assistance, or (2) receives average family income which is less than one hundred twenty-five (125) percent of the federal poverty line, or (3) cannot support his or her family and his or herself and also satisfy the requirements of section 447.120 without substantial hardship ....
(2) Parade applicants for organizations. In addition, if the proposed parade is to be conducted for, on behalf of, or by an organization, the applicant shall disclose assets held in the name of such organization. The parade applicant must certify to the best of his or her knowledge that the mission, operation, or existence of the organization will be substantially threatened if the requirements of section 447.120 must be satisfied by the organization.

Id.

There are undoubtedly threshold difficulties in these systems of deciding who, in *57 fact, qualifies for the fee exemptions. A determination that fees “exceed the available resources of the sponsor/organization,” or that the “existence of the organization will be substantially threatened” if it is required to pay a parade fee involves subjective judgments about allocation of limited resources. Does a nonprofit need to forego mailing this month’s newsletter so the cost of postage can be reallocated to parade expenses? Does it need to reassign parade participants who otherwise would be carrying placards to traffic control duties? See Goldberger, 62 Tex. L.Rev. at 410-11 (noting that “Cox provides no standards for determining what constitutes an oppressive charge” and that the Court did “not indicate whether a charge that might deplete ten percent, twenty-five percent, or fifty percent of a speaker’s treasury is excessive or whether such a charge is tolerable”); see Bandy Declaration at 7, App. at 115 (“[Tjhere have been cases where fees imposed on movements for poor people and the homeless in order to hold public demonstrations had the effect of substantially straining the resources of those organizations because they rely heavily upon volunteer organizers and have no offices or regular sources of income.”).
These sorts of questions, however, speak to the problems inherent in charging anyone for the exercise of First Amendment rights in streets and other public ways. Even those for whom a parade fee is affordable may be deterred by the prospect of paying several thousand dollars to finance their message. Indeed, the fees deemed permissible — for traffic control, for example — are for “the same services [ ] routinely provided without charge to non-speech users of streets, sidewalks, and parks,” thereby “devaluing] speech activities in comparison to nonspeech activities.” Id. 411; see also Neisser, 74 Geo. L.J. at 332 (“[Pjolice service fees inherently discriminate against planned public gatherings for expressive purposes, which the first amendment is designed to protect.”).
Hence, there is a plausible policy argument that the responsibility for financing First Amendment activities in public fora should belong to the community at large. At a minimum, a government subsidy is a First Amendment imperative when individuals who lack the means to pay required fees seek access to a uniquely powerful public forum for the purpose of speaking on a matter of public concern.
The costs need not be prohibitive for local governments, nor necessarily borne by a single entity. As the likely target of protestors with statewide concerns, a city that serves as the state capital — like Augusta — reasonably could look to state coffers to help finance street marches drawing residents from throughout the state. See Neisser, 74 Geo. L.J. at 340-42. Alternatively, allowing indigent applicants to provide their own traffic monitors — perhaps with prior training provided by the police department — could help reduce the cost of monitoring parades.[25] Other approaches for balancing the government’s interest in recouping costs and the speaker’s right of access to the streets also seem viable: applicants for permits who lack resources may be able to meet city fee requirements through on-the-scene fund raising if offered the opportunity to pay after their event, or perhaps shorter routes or time periods could be designated for such marches, so long as the speaker’s message is not improperly compromised. Creative government officials could devise additional solutions that meet constitutional requirements.
*58 III.
When fundamental interests are at stake, the Supreme Court has held repeatedly that the government may not deny equal access to indigents based solely on their inability to pay required fees. The right to march in the streets to disseminate a message of public concern is at the core of the First Amendment and could not be more fundamental. Thus, a parade ordinance that conditions access to the streets on ability to pay cannot withstand the heightened scrutiny applicable to such limitations because, for the reasons I have explained, the streets are a uniquely powerful forum for reaching a wide audience to express views on public policy. No speaker may be denied access for such expression in that forum based on an inability to pay the associated costs. The district court held correctly that “the Parade Ordinance must afford a fee waiver for those unable to pay.” 406 F.Supp.2d at 126. I respectfully dissent from the majority’s contrary conclusion.

. The dual rationale arises in the judicial access cases, where the due process concern relates to the "essential fairness of the state-ordered proceedings anterior to adverse state action” and the equal protection concern "relates to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs.” M.L.B., 519 U.S. at 120, 117 S.Ct. 555. However, Justice Ginsburg noted in M.L.B. that most of the decisions used an equal protection framework. Id.

. Among the cases cited were Regan v. Taxation with Representation of Wash., 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983), which rejected a nonprofit organization’s claims, on First Amendment and equal protection grounds, that they were entitled to receive tax deductible contributions to support their lobbying activity, and Harris v. McRae, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), which held that women seeking medically necessary abortions were not entitled to Medicaid funding.

. My analysis considers only speech on matters of public concern, the type of expression for which the plaintiffs in this case sought parade permits.

. The majority opinion notes that, despite the Supreme Court's consideration of parade permits in some detail in Forsyth, the Court did not there “suggest! ] that an indigency exception is constitutionally required.” The indigency issue was not before the Court in Forsyth. The Court granted certiorari in For-syth "to resolve a conflict among the Courts of Appeals concerning the constitutionality of charging a fee for a speaker in a public forum.” 505 U.S. at 129, 112 S.Ct. 2395. The five justices in the Forsyth majority bypassed the question of the permissible size of a fee, concluding that the challenged ordinance was invalid because it lacked procedural safeguards and tied the fee to the content of speech. Id. at 137, 112 S.Ct. 2395.

. Plaintiffs' Statement of Material Facts reported that Sullivan sought to participate in the march “as a way of expressing his opposition to the war in Iraq and as a way of publicly advocating the need for affordable health care, veterans’ rights and benefits, and living wage jobs, and as a way of associating himself publicly with individuals and groups who share his views.” According to the Statement, Dansinger sought to march "as a way of expressing his opposition to the war in Iraq, supporting the Million Worker march and publicly advocating the need for economic justice in America, and to associate with others to advocate effectively for those goals.”

. Mass marches alongside well traveled roads also have a long history and can have dramatic communicative effect. See, e.g., Williams v. Wallace, 240 F.Supp. 100, 104-05, 107-08 (D.C.Ala.1965) (describing disrupted Selma-to-Montgomery voting rights march on March 7, 1965, and proposal for a subsequent march later that month).

. From a case-specific perspective, the sidewalk option here was particularly limiting. Deputy Police Chief Gregoire stated in his deposition that the sidewalks along the appel-lees’ proposed parade route had room for two, perhaps three, people of average size to walk side-by-side.

. Professor Neisser also noted the importance of ensuring free public fora:
The first amendment may not mandate or even tolerate affirmative government action to overcome the disparities in communicative effectiveness wrought by the marketplace's pricing structure and the differing financial x-esources of competing groups. Yet, if the first amendment is to assure a safety valve for dissatisfaction, genuine discussion of public policy, ascertainment of new scientific truths or cultural forms, and individual self-development, the public system of expression must, at a minimum, avoid replicating the private market's price structure and thereby reinforcing its inequities.
74 Geo. L.J. at 297 (footnotes omitted).

. Pittsburgh's application fee for "First Amendment Activity” is set at an amount that "reflects the cost of evaluation and scheduling the event.” § 470.04. The city also requires payment of "cost recovery fees” for the cost of providing public safety and public works services. § 470.06. The total for the application and cost recovery fees for parades may not exceed specified amounts that vary depending on the parade's timing and duration. For example, the maximum charge for a weekday parade lasting no more than two hours is $500 while the maximum is $3,000 for a parade on a weekend or city holiday that lasts more than two hours. § 470.04. However, the city assumes the first $750 of "all costs associated with First Amendment Activity, Parades, community events and block parties.” § 470.06(d). Costs for city services that exceed $750 are split equally between the City and the Special Event sponsor, with parades being subject to the maximum fees stated in § 470.04. Id.

. Professor Neisser reported that such an approach was adopted by the City of Palo Alto, California. See Neisser, 74 Geo. L.J. at 339 n. 387.