**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2201-22

RAJEH A. SAADEH,

     Plaintiff-Respondent,

v.

NEW JERSEY STATE BAR
ASSOCIATION,

     Defendant-Appellant.

_____

        Argued January 18, 2024 – Decided December 20, 2024

        Before Judges Accurso, Gummer and Walcott-Henderson.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-6023-21.

        Lawrence S. Lustberg argued the cause for appellant (Gibbons PC, attorneys; Lawrence S. Lustberg and Julia Bradley (Gibbons PC) of the New York bar, admitted pro hac vice, on the briefs).

        Lindsay A. McKillop argued the cause for respondent (Law Office of Rajeh A. Saadeh, LLC, attorneys; Lindsay A. McKillop, on the brief).

Rajiv D. Parikh argued the cause for amici curiae Asian Pacific American Lawyers Association of New Jersey, Garden State Bar Association, Hispanic Bar Association of New Jersey, New Jersey Women Lawyers Association, and South Asian Bar Association of New Jersey (Genova Burns LLC, attorneys; Rajiv D. Parikh and Maria R. Fruci, of counsel and on the brief; Kenneth J. Sheehan and Katherine Szabo, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

The New Jersey State Bar Association appeals on our leave from an order granting partial summary judgment on liability to plaintiff Rajeh A. Saadeh, a fifteen-year member of the Association and former member of its Board of Trustees, on his claim that the Bar Association has discriminated against him in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -50, by setting aside at-large seats on its Board, Nominating Committee, and Judicial and Prosecutorial Appointments Committee (JPAC) to be filled by individuals from demographic groups traditionally underrepresented in leadership positions in the Association.

The trial court found the Association was either a public accommodation or a private club or association as defined in the LAD, and its reservation of thirteen out of the total of ninety-four seats available on the Board, the

Nominating Committee, and JPAC for attorneys from underrepresented groups was an impermissible quota system that violated the statute and unlawfully discriminated against Saadeh. The court rejected the Association's claim that the addition of at-large seats to its leadership bodies constitutes a bona fide affirmative action program and disallowing it would impermissibly infringe on the Association's First Amendment expressive associational right to advocate its support of diversity in the legal profession.

We reverse. Even were we to conclude the Bar Association's method of filling at-large seats on its Board of Trustees, Nominating Committee, and JPAC constituted unlawful discrimination in a place of public accommodation, N.J.S.A. 10:5-12(f)(1), or private association, N.J.S.A. 10:5-12(f)(2), in violation of the LAD — an issue we expressly do not reach — the undisputed facts in the record establish the Association has long been committed to promoting the importance of diversity within the legal profession, a value it expresses, among other ways, by ensuring its leadership reflects its vision of diversity and inclusion. Compelling the Association to alter or eliminate its program to ensure diversity in its leadership to comply with the LAD would significantly burden the expression of its views, thus running afoul of the

3

Association's First Amendment right of expressive association.  See Boy
Scouts of Am. v. Dale, 530 U.S. 640 (2000).

The essential facts are undisputed.  The Bar Association is a not-for-profit corporation maintaining its principal place of business at the Law Center in New Brunswick.  As set forth in its by-laws, its stated purpose is "to maintain the honor and dignity of the profession of the law; to cultivate social relations among its members; [and] to suggest and urge reforms in the laws and to aid in the administration of justice."  "Any person who is a member in good standing of the Bar of New Jersey or who holds a limited license to practice" here is eligible for general membership.

In pursuing its purposes, the Bar Association regularly engages in a broad range of activities including professional and personal support of New Jersey's lawyers through continuing legal education programming as well as networking and career services; and advocacy efforts before the New Jersey Legislature and the courts, including tracking and developing positions on pending state legislation, regularly reviewing and commenting on proposed changes to the court rules, and participating as amicus curiae in litigation.

The Association maintains its efforts to increase diversity in the legal profession and more generally address racial equity in the law are wide-

4

ranging and affect both the legal community and the public. Among the issues the Bar Association brings to our attention as its having addressed are implicit bias in jury selection, landlord-tenant matters, right to counsel, public access to name change proceedings, First Amendment issues, local civilian review boards, same-sex marriage, implementation of marijuana reform legislation, criminal justice reform, diversity training for judges, attorneys and law clerks, access to the courts, and anti-bullying proposals in schools. The Association publicly reports on these various activities.

Of the State's approximately 98,000 lawyers, some 16,000 are members of the Association. The Association manages its affairs through its Board of Trustees, which is also responsible for establishing the Association's official policies and positions. The forty-nine-member Board is made up of a cross-section of the general membership with seats reserved for officers, county bar associations, section and committee representatives and members of demographic groups underrepresented in the leadership of the Association. Specifically, the Board consists of the Officers (President, President-Elect, First Vice President, Second Vice President, Treasurer, Secretary and Immediate Past President); two Trustees from the Young Lawyers Division; nine Trustees from the Association's various Sections and Committees; eight

5

at-large Trustees; a designee of the State Bar Foundation; and one Trustee from each county except Essex, which has two.

The Bar Association holds itself out as "promoting and fostering a diverse and inclusive bar association," which it defines as including "race, ethnicity, gender, gender identity, sexual orientation, religion, age, and disability."  And it engages in efforts to promote diversity and inclusion within its ranks.  It employs a Director of Diversity, Inclusion and Community Engagement who "serves as the staff liaison for the Diversity Committee and New Jersey diverse/affinity bar associations," working to develop strategies "for increasing participation of diverse lawyers" with the Association.  Its Diversity Committee is a standing committee, which "[f]acilitates the NJSBA's goal of fostering and promoting an inclusive environment that values the unique contributions of diverse individuals and organizations in all aspects of the Association."  The Association also has in place a diversity policy in connection with its continuing legal education program that expresses a "goal . . . to increase diversity on CLE panels and presentations, so as to better reflect the diversity of the legal profession and our membership."

The Association began its efforts to promote diversity in its leadership in 1989 by creating two at-large seats on its then thirty-one-member Board of

Trustees, filled on an informal, rotating basis by Hispanic, Asian-Pacific, and African American members. In 1999, the Association ended the need for rotating by establishing a third at-large seat on the Board, thus reserving an at-large seat for a member from each of these three demographic groups.

In 2005, based upon a recommendation from the Diversity Committee, the Association membership approved a by-law amendment adding two more at-large seats on the Board of Trustees, to include other groups besides Hispanic, Asian-Pacific, and African American members. The stated purpose of the amendment was to "permit broader representation on the Board of Trustees that can include other groups besides those that have historically filled the current three seats." In 2006, the Board identified two other underrepresented segments of the membership to be included for consideration of the additional two seats: lawyers in the LGBT community and "senior lawyers" over the age of seventy.

In 2010, the membership approved three additional at-large seats on the Board of Trustees and determined the Board would annually designate the underrepresented segments of the organization that could fill those seats. The Association also adopted by-law language stating the purpose of the at-large

A-2201-22

trustee positions was to promote inclusion of as many underrepresented segments of the membership on the Board of Trustees as possible.

Thus, the most recent by-law language in the record (2020) provides:

> Every At-Large Trustee shall be elected from, among and by the general members of the Association to represent segments of the membership not adequately represented on the Board of Trustees. The designation of these underrepresented segments of the membership to be considered when nominating candidates for the At-Large Trustee seats shall be made by the Board of Trustees prior to September 30 each year. If no designation is made, the designations in place for the prior year shall remain. Nothing in this section shall be construed to mean that a member from any underrepresented segment can be prohibited from serving on the Board of Trustees because another member from that same underrepresented group is already serving as a Trustee. The purpose of the At-Large Trustee positions is to promote inclusion of as many underrepresented segments of the membership on the Board of Trustees as possible. Any interpretation of this section of the Bylaws shall be consistent with that purpose.

In September 2021, the Association added members of a "diversity bar association" to the underrepresented groups to be considered for the three open at-large trustee seats.[1] At the time suit was filed, the approved designations

---

[1] The Bar Association defines a "diversity bar association" as "those bar associations representing discrete underrepresented segments of the legal profession." The Association policy manual recognizes the following diversity

for at-large seats were, as expressed by the Bar Association:  one seat each for members who are Hispanic/Latino/a/x, Asian/Pacific American, Black/African American, members of the LGBTQ+ community, or women; and three non-designated seats open to members from any of the following groups: Hispanic/Latino/a/x, Asian/Pacific American, Black/African American, members of the LGBTQ+ community, senior lawyers over seventy, women, attorneys with disabilities, or attorneys who are members of a diversity bar association recognized by the Association.

At-large members are also selected for the Bar Association's Nominating Committee and JPAC.  The Nominating Committee is responsible for qualifying candidates for positions on the Board of Trustees and Nominating Committee, and delegates to the American Bar Association.  The Association's by-laws provide:

> The Nominating Committee shall, in its nomination of candidates, consider all appropriate factors, including but not limited to, service to the Association and its

---

bar associations:  the Asian Pacific Lawyers of New Jersey, the Association of Black Women Lawyers of New Jersey, the Association of Portuguese Speaking Attorneys of New Jersey, the Caribbean Bar Association of New Jersey, the Garden State Bar Association, the Haitian American Lawyers of New Jersey, the Hispanic Bar Association of New Jersey, the Korean Bar Association of New Jersey, the New Jersey Women Lawyers Association, the New Jersey Muslim Lawyers Association, and the South Asian Bar Association of New Jersey.

A-2201-22

constituent parts, service to County and/or Diversity Bar Associations, the extent of practice in the State of New Jersey, including but not limited to government and corporate service, geographical balance, and the goal of bringing into the Association's leadership broad and diverse representation of all segments of the Bar. Before nominating a candidate to any respective position, the Nominating Committee shall consult with the groups outlined elsewhere in these Bylaws, but shall not accept endorsements for any candidate from any group.

The Nominating Committee consists of fifteen members: one presidential appointee; the immediate past president; the chair of the young lawyers division; four section chairs, not to include the women in the profession and minorities in the profession sections, two from the larger sections and one each from the mid-size and smaller sections; two county trustees from among those serving on the Board; the chair of the women in the profession section or the chair of the minorities in the profession section, alternating; two from underrepresented groups; and three elected by the general membership.

JPAC is responsible for conducting "a confidential review of prospective judicial and county prosecutor candidates and advises the Governor whether the prospective candidates are qualified for appointment for those offices" pursuant to a compact "established with the Governor." Members of JPAC are

appointed by the president of the Association, who "shall consider the goal of broad diverse representation of all segments of the Bar." There are thirty members of JPAC: one from each county; the president, the president-elect and the immediate past president; one chairperson; two vice-chairpersons, one from South Jersey and one from North Jersey; and three at-large from underrepresented groups.

Saadeh is an attorney licensed to practice law in New Jersey since 2010. He maintains a general practice in Somerset County. He has been a member of the Bar Association since he was in law school. Saadeh has been appointed to serve on five different committees[2] and has been a member of twelve different sections.[3] In addition, between 2019 and 2021, he served on the Board of Trustees as the designated representative of the young lawyers' division. Since his term of service ended, Saadeh has not pursued any other positions

---

[2] Saadeh has served on two standing committees: the diversity and amicus committees, and three special committees: the equity jurisprudence, appellate practice, and continuing legal education committees.

[3] Saadeh has been a member of the young lawyers' division, and the family law, real property trust and estate, solo and small firm, minorities in the profession, business law, criminal law, entertainment and arts law, federal practice, intellectual property, international law, and labor and employment law sections.

A-2201-22

potentially available to him on the Board of Trustees, the Nominating Committee, or JPAC. Saadeh is a current member and past president of the New Jersey Muslim Lawyers Association, one of the diversity bar associations recognized by the Association. He describes himself as a Palestinian Muslim American.

In his operative complaint filed in November 2021, Saadeh asserted causes of action for unlawful discrimination and violation of his civil rights based on race, color, national origin, age, sex, gender identity or expression, affectional or sexual orientation, and disability, contrary to the LAD with respect to the Bar Association's selection of at-large members of its Board of Trustees, Nominating Committee, and JPAC.[4] Saadeh sought compensatory and punitive damages; interest; costs of suit and investigation; attorney fees; a declaration that the Bar Association has unlawfully discriminated against him in violation of the LAD; and injunctive relief "restraining and enjoining current, continued, and future violations" of the LAD, including: the vacating of all "at-large" Trustee seats, as well as Nominating Committee and JPAC

---

[4] Saadeh filed his original complaint with a proposed order to show cause seeking temporary restraints. The court signed the order to show cause but denied temporary restraints. We denied Saadeh's motion for leave to appeal as did our Supreme Court.

positions filled in violation of the LAD, and prohibiting the Association from filling those seats until it does so in compliance with the LAD; and compelling the Bar Association to revise its designation of underrepresented groups so as not to be in violation of the LAD.

The parties made early cross-motions for summary judgment, which were denied by the court. In a written statement of reasons, the court found there were material issues of fact precluding any finding that the Bar Association was a place of public accommodation, that the Association's designation of at-large seats on its Board of Trustees, Nominating Committee and JPAC constituted an illegal quota system, and if so, whether reordering those reserved seats in a manner Saadeh might find preferable would violate the Association's "constitutionally protected right to freedom of expressive association."

The Bar Association moved for reconsideration, and Saadeh sought leave to appeal the denial of his summary judgment motion. Following our denial of leave to appeal, Saadeh filed a cross-motion for reconsideration in the trial court. The motion judge's retirement required the parties' cross-motions for reconsideration to be heard by a different judge.

13

Reviewing the prior ruling, the new judge noted the prior judge's statement that he agreed with Saadeh's

> position that "if the 'women only' label were removed from the 'women only' Board of Trustees seat, women would still be eligible to obtain said seat without excluding others due to sex or gender, and all consistent with the [Bar Association's] abstract, foggy concept of diversity."  This suggestion would likely solve a lot of the issues that [Saadeh] alleges are present within the [the Association], however it will also violate [the Association's] constitutionally protected right to freedom of expressive association.

The judge on reconsideration found that

> [n]otwithstanding [that] finding, the original judge in this matter, anomalously, denied the defendant's motion for summary judgment.  If this court finds that the [prior orders on the summary judgment motions] reflected erroneous rulings, then it is this court's responsibility to correct that error. . . .  As noted in Lawson [v. Dewar, 468 N.J. Super. 128, 135 (App. Div. 2021)], "[t]he polestar is always what is best for the pending suit; it is better to risk giving offense to a colleague than to allow a case to veer off course."

The new judge decided there were no fact issues in dispute and that Saadeh was entitled to judgment as a matter of law.  The judge found there was no need to decide whether the Bar Association was a public accommodation under N.J.S.A. 10:5-12(f)(1) because the LAD extends to private clubs and associations under N.J.S.A. 10:5-12(f)(2), making it illegal

14

for a "private club or association to directly or indirectly . . . deny to any . . . club member . . . any of the . . . advantages . . . or privileges thereof, or to discriminate against any member in the furnishing thereof" based on the member's "race, creed, color, national origin, ancestry, marital status, civil union status, domestic partnership status, pregnancy or breastfeeding, sex, gender identity, or expression, affectional or sexual orientation, disability, liability for service in the Armed Forces of the United States or nationality of such person."

The judge concluded the Association's "program which has evolved into the creation of 13 'at-large' leadership seats reserved exclusively for members of underrepresented groups is [an illegal] quota system" because Saadeh, "a Palestinian Muslim American attorney, [is] foreclosed from obtaining" any one of the five seats on the Board of Trustees reserved for members of specific identity groups and is not eligible for one of the other eight at-large seats on the Board of Trustees, as well as one of the two at-large seats on the Nominating Committee and the three at-large seats on JPAC without the prerequisite of membership in a diversity bar association not required of African American, Hispanic or Asian Pacific members, members of the

15

LGBTQ+ community, women, members over the age of 70, or disabled members.

The judge accepted Saadeh's position "that it is of no moment that 41 seats on the [Board of Trustees], 13 seats on the [Nominating Committee], and 27 seats on JPAC are not discriminatory," finding Saadeh "has been unlawfully discriminated against by being excluded from eligibility (or 'automatic' eligibility) for the 13 at-large leadership seats of the [Bar Association]." The judge found "the issues in this case are centered only around those 13 at-large seats, not the entire composition" of the Board of Trustees, the Nominating Committee, and JPAC.

The judge rejected the Bar Association's claim that it has a First Amendment right of expressive association to select a governing body of leaders that is consistent with the Association's values based on the United States Supreme Court's opinion in Dale, and, as a constitutional matter, the LAD cannot be read to require the Association "to allow an unwanted imbalance in racial, ethnic, or gender representation within its leadership bodies where that imbalance expresses a message that is contrary to the [Association's] values." The judge found Dale "inapposite . . . for the simple

reason that Dale was about forced inclusion and this case is about forced exclusion."

The judge further found that to adopt the Bar Association's argument on the constitutional issue "would be tantamount to giving [it] carte blanche in formulating any diversity program, because, regardless of whether that program violated the NJLAD, it would be permissible because the [Bar Association's] First Amendment right would always trump the NJLAD." "In other words, to accept the [Association's] . . . argument would render the NJLAD meaningless."

The judge denied the Bar Association's motion for summary judgment and granted Saadeh's cross-motion for summary judgment on liability and ordered the case to trial on damages. Although denying immediate injunctive relief, the judge granted prospective relief, ordering that as any of the thirteen at-large seats on the Board of Trustees, the Nominating Committee or JPAC became vacant, or were to be filled or re-filled by the Bar Association, "every member in good standing . . . shall be eligible to apply."

The Bar Association moved for a stay, and Saadeh moved for reconsideration of the judge's denial of immediate injunctive relief. Following argument, the judge rendered an oral opinion and issued an order denying both motions. We granted the Association's motion for leave to appeal and denied

Saadeh's motion for leave to appeal from the order denying him immediate injunctive relief. The Supreme Court likewise denied Saadeh's motion for leave to appeal.

We review summary judgment using the same standard that governs the trial court. C.V. by & through C.V. v. Waterford Twp. Bd. of Educ., 255 N.J. 289, 305 (2023). As the parties agreed on the material facts for purposes of the motion, our task is limited to determining whether the trial court's ruling on the law was correct. R. 4:46-2(c). Our review of legal issues is, of course, de novo; we owe no deference to the trial court's interpretation of the law or its application of the law to established facts. Sipko v. Koger, Inc., 251 N.J. 162, 179-80 (2022); Jeter v. Sam's Club, 250 N.J. 240, 251 (2022); Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

Relying on the United States Supreme Court's decision in Dale, the Bar Association contends it has a First Amendment right of expressive association to select a governing body of leaders that is consistent with the Association's values. Therefore, as a constitutional matter the LAD cannot be read to require the Association "to allow an unwanted imbalance in racial, ethnic, or gender representation within its leadership bodies where that imbalance expresses a message that is contrary to the [Association's] values."

Saadeh responds that "stopping the [Association] from discriminating does not violate its freedom of expressive association." He argues the Bar Association has not identified any viewpoint it espouses, that enjoining the Association from discriminating would not significantly burden its ability to advocate its viewpoints, and that enjoining it from engaging in invidious discrimination outweighs any burden imposed on its alleged associational expression.

We granted leave to the Asian Pacific American Lawyers Association of New Jersey, the Garden State Bar Association, the Hispanic Bar Association of New Jersey, the New Jersey Women Lawyers Association, and the South Asian Bar Association of New Jersey to appear and participate as amici curiae.[5] See R. 1:13-9(a). Although amici did not weigh in on the constitutional issue, they argue generally that the Bar Association's "affirmative action plan" is necessary, effective, and lawful. They note that although New Jersey is one of the most diverse states in the country, until

---

[5] Amici contend they "comprise and represent thousands of attorneys within the State that identify as a member of a minority group" and that their "organizations represent attorneys from backgrounds that have historically been underrepresented in the legal profession, based upon gender, race, background, language, and other similar characteristics." They represent that their members "are actively engaged in the [Bar Association] as members and as leaders, as well as within the broader legal community."

A-2201-22

2010 the Association's leadership "was white, straight, and male" and has become significantly less so in recent years, "clearly evidencing the value and benefit of the program."

Amici argue that racial and ethnic diversity in the legal profession is critically important in demonstrating our laws are made and justice administered for the benefit of all persons. They contend that "[w]ithout an emphasis on diversity and inclusion, particularly among state bar associations, it is unlikely . . . within any reasonable time frame" that the legal profession will become more diverse. Amici maintain "ensuring the diversity of the State Bar is critical to ensuring the legal community represents the experiences of its members and meets the needs of New Jersey's citizens." Thus, they argue, notwithstanding that the legal profession as a whole lags behind other professions in minority representation, the Association's affirmative action program "has resulted in greater leadership participation from underrepresented groups and created a more representative bar association."

The First Amendment, U.S. Const. amend. I, applicable to the States through the Fourteenth Amendment, U.S. Const. amend. XIV, prohibits the States from making any law "abridging the freedom of speech . . . or the right of the people peaceably to assemble, and to petition the Government for a

redress of grievances." The First Amendment also protects conduct that is inherently expressive. Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc., 547 U.S. 47, 66 (2006).

The United States Supreme Court has held "[a]n individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." Roberts v. U.S. Jaycees, 468 U.S. 609, 622 (1984). "Consequently . . . implicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." Ibid.

The Court has made clear that the freedom of association also implies a freedom not to associate. Ibid. That is, "[t]he forced inclusion of an unwanted person in a group infringes the group's freedom of expressive association if the presence of that person affects in a significant way the group's ability to advocate public or private viewpoints." Dale, 530 U.S. at 648.

The Court has recognized that "intrusion into the internal structure or affairs of an association" can unconstitutionally burden its expressive

21

associational right.  Ibid.; Roberts, 468 U.S. at 622-23.  It has also acknowledged, however, that "the freedom of expressive association . . . is not absolute" and can "be overridden 'by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms.'"  Dale, 530 U.S. at 648 (quoting Roberts, 468 U.S. at 623).

In Dale, our Supreme Court held the Boy Scouts of America is a place of public accommodation under N.J.S.A. 10:5-12(f)(1); found its expulsion of James Dale as an adult member and assistant scout master, after he had been identified in the Star Ledger as "co-president of the Rutgers University Lesbian/Gay Alliance," based on the Boy Scouts' policy of excluding openly gay men and boys as members violated the LAD; and affirmed our holding that although "the First Amendment protects Boy Scouts' goals and activities, . . . the relationship between Boy Scouts' stated goals and Boy Scouts' exclusionary practice was not significant enough to overcome the compelling state interest in eradicating invidious discrimination."  Dale v. Boy Scouts of Am., 160 N.J. 562, 570-71, 578, 582 (1999), rev'd and remanded sub nom. Boy Scouts of Am. v. Dale, 530 U.S. 640 (2000).

Specifically, our Supreme Court held the LAD's public accommodation provision did "not violate Boy Scouts' freedom of expressive association" because it didn't "have a significant impact on Boy Scout members' ability to associate with one another in pursuit of shared views."  The Court found "Boy Scout members do not associate for the purpose of disseminating the belief that homosexuality is immoral."  Id. at 612.  Moreover, the Court found the "Boy Scouts' litigation stance on homosexuality appear[ed] antithetical" to its commitment "to a diverse and 'representative' membership."  Id. at 617-18. The Court concluded "that Dale's membership [did] not violate Boy Scouts' right of expressive association because his inclusion would not 'affect in any significant way [Boy Scouts'] existing members' ability to carry out their various purposes.'"  Id. at 615 (quoting Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. 537, 548 (1987)).

In reversing our Supreme Court, the United States Supreme Court, although noting "New Jersey's statutory definition of '[a] place of public accommodation' is extremely broad," expressed no opinion on our Court's finding that the Boy Scouts qualified as such.[6]  Dale, 530 U.S. at 656-57.  It

_____

[6]  Although an obvious state law question, the Supreme Court noted that "[f]our State Supreme Courts and one United States Court of Appeals have

simply observed that "[a]s the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict between state public accommodations laws and the First Amendment rights of organizations has increased." Id. at 657.

The Court had no hesitation in concluding the Boy Scouts "engages in 'expressive association,'" as "[t]he First Amendment's protection of expressive association is not reserved for advocacy groups." Id. at 648. The Court found the Boy Scouts' general mission of instilling values in its youth members "by having its adult leaders spend time with the youth members, instructing and engaging them in activities like camping, archery, and fishing" rendered it "indisputable that an association that seeks to transmit such a system of values engages in expressive activity." Id. at 649-50.

It disagreed with our Supreme Court that including Dale as an assistant scoutmaster would have no significant impact on the Boy Scouts' ability to express its "members' shared expressive purpose," 160 N.J. at 615, which the

_____

ruled that the Boy Scouts is not a place of public accommodation" and "[n]o federal appellate court or state supreme court — except the New Jersey Supreme Court in this case — has reached a contrary result." Dale, 530 U.S. at 657 n.3.

high Court termed the Boy Scouts' "desire to not 'promote homosexual conduct as a legitimate form of behavior.'" 530 U.S. at 653. It held "associations do not have to associate for the 'purpose' of disseminating a certain message in order to be entitled to the protections of the First Amendment. An association must merely engage in expressive activity that could be impaired in order to be entitled to protection." Id. at 655. And it rejected our Supreme Court's criticism of the inconsistency in the Boy Scouts' exclusion of Dale based on his sexual orientation and its professed commitment "to a diverse and 'representative' membership," noting it's "not the role of the courts to reject a group's expressed values because they disagree with those values or find them internally inconsistent." Id. at 650-51.

The Court instead instructed that the same deference courts give "to an association's assertions regarding the nature of its expression," must also be accorded "an association's view of what would impair its expression." Id. at 653. The Court found "Dale's presence in the Boy Scouts would, at the very least, force the organization to send a message, both to the youth members and the world, that the Boy Scouts accepts homosexual conduct as a legitimate form of behavior." Ibid. Putting the Boy Scouts' associational interest in freedom of expression "on one side of the scale" and the State's interest in

ending discrimination based on sexual orientation on the other, the Court concluded "a state requirement that the Boy Scouts retain Dale as an assistant scoutmaster would significantly burden the organization's right to oppose or disfavor homosexual conduct," and "[t]he state interests embodied in New Jersey's public accommodations law do not justify such a severe intrusion on the Boy Scouts' rights to freedom of expressive association." Id. at 658-59.

Applying Dale to the undisputed facts in this record establishes beyond peradventure that the Bar Association qualifies as an expressive association, and that compelling it to end its practice of ensuring the presence of designated underrepresented groups in its leadership would unconstitutionally infringe its ability to advocate the value of diversity and inclusivity in the Association and more broadly in the legal profession.

The record reflects the Association's many forms of public expression and advocacy on matters of public concern, including the importance of diversity within the Association, in the legal community, and in continuing legal education. See Roberts, 468 U.S. at 626-27 (finding Jaycees' public positions on diverse issues and regular engagement in variety of civic activities "worthy of constitutional protection under the First Amendment"). Contrary to Saadah's argument, the Bar Association also engages in expressive activity in

26

determining the composition of its governing Board of Trustees and other leadership bodies.

The Association's by-laws are explicit in requiring representation of a cross-section of its membership on the Board of Trustees, the Nominating Committee and JPAC. In addition to allocating slots to members representing the county bar associations and a mix of sections, the by-laws also reserve slots for members representing demographic groups historically underrepresented in the Association's leadership, a consciously deliberate choice expressing the Association's vision of diversity and inclusion in the Association and in the broader legal community.

Given the Bar Association engages in expressive activity and that it does so through its method for filling at-large seats on its Board of Trustees, Nominating Committee and JPAC, we next consider whether compelling the Association to alter or eliminate its inclusion program "would significantly affect" the Association's "ability to advocate" its viewpoints. See Dale, 530 U.S. at 650.

As the Bar Association argues in its brief, its "message is clear"; it "deeply values diversity in the legal profession," and it expresses that value in the "intentional makeup" of the Board and Committees that lead the

Association. The Bar Association's decades-long commitment to diversifying its leadership, as established in the record, leaves no doubt about the sincerity of its commitment. See id. at 651-53.

The Association maintains that forcing it to end its long-standing practice for filling at-large seats runs "the risk, borne out by history," that "underrepresented groups will not be guaranteed a seat at the table." It contends that would undermine the Association's "expression of commitment to promoting equal participation" within the Association and interfere with its efforts "to maintain a leadership that models the very diversity it champions publicly."

The Association argues "an unwanted imbalance in racial, ethnic, or gender representation within its leadership bodies" would impair its effectiveness as "a collective voice in matters of concern to the legal profession" and force it "to send the undesired message that it no longer cares, or cares as much, about diversity in general or about assuring access to leadership positions for underrepresented groups in particular." As the Supreme Court has commanded, we are obliged to "give deference to an association's view of what would impair its expression." Id. at 653. "[T]he choice of a speaker not to propound a particular point of view . . . is presumed

to lie beyond the government's power to control." Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos., 515 U.S. 557, 575 (1995).

As the Bar Association's commitment to the importance of diversity in the legal profession has been much more a fixture of its private and public expressions than the Boy Scouts' former views on homosexuality were in its private and public messaging, we are satisfied the Association has established that forcing it to alter its method of filling at-large positions in its leadership would significantly burden its ability to express its views.

Having determined the Bar Association is an expressive organization and that forcing it to end its method of guaranteeing the participation of underrepresented demographic groups in its leadership "would significantly affect its expression, we inquire whether the application of New Jersey's public accommodations law to require" that the Association end its method of filling at-large seats on the Board of Trustees, Nominating Committee and JPAC "runs afoul of [the Association's] freedom of expressive association." See Dale, 530 U.S. at 656. The Third Circuit has characterized this analysis as a weighing of the State's interests in applying its law against the association's interests in freedom of expression. Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh, 229 F.3d 435, 442 (3d Cir. 2000).

29

There is no question but that New Jersey has a compelling interest in eliminating discrimination on the basis of race, color, national origin, sex, gender identity or expression, affectional or sexual orientation, and disability under its public accommodation and private association law.[7]  See Dale, 530 U.S. at 659.  But, as in Dale, that interest — an interest the Association believes it is vindicating — does not justify the "severe intrusion" of prohibiting the Association from expressing views protected by the First Amendment — here, the value of demographic diversity in the legal profession and in its own leadership.  The Association cannot be forced to send the message "that it no longer cares, or cares as much, about diversity in general or about assuring access to leadership positions for underrepresented groups in particular" by ending its practice of reserving thirteen of the ninety-four seats on its Board of Trustees, Nominating Committee and JPAC for members who are Hispanic/Latino/a/x, Asian/Pacific American, Black/African American, members of the LGBTQ+ community, women, senior lawyers over seventy,

―――――――――――――――

[7]  That is, all those bases for Saadeh's claims of discrimination with the exception of age, which is not included in our public accommodation laws. See C.V., 255 N.J. at 320 ("Although the LAD makes it 'unlawful' for an employer to discriminate 'because of . . . age in employment,' N.J.S.A. 10:5-12(a), there is no comparable prohibition on places of public accommodation."); N.J.S.A. 10: 5-12(f)(1) and (2).

30

attorneys with disabilities, or attorneys who are members of a diversity bar association recognized by the Association. See Hurley, 515 U.S. at 575.

The judge on reconsideration deemed Dale inapposite, because "Dale was about forced inclusion and this case is about forced exclusion." But Saadeh, like Dale, is complaining about exclusion — Dale from membership in the Boy Scouts and Saadeh from leadership in the Bar Association. As Saadeh writes in his brief, he "is not eligible or automatically eligible for the 13 seats at issue" based on his identity, just as Dale was not eligible for membership in the Boy Scouts based on his. Dale is, without question, controlling here, and Saadeh's — and the trial court's — efforts to distinguish it are indistinguishable from the arguments the Supreme Court rejected in that case and we've rejected in this one.

Saadeh has a different vision of a diverse leadership for the Association, and he objects to the Association's vision because, among other reasons, it does not take him, someone "indisputably diverse" into account. Although arguing that "[a]ffirmative action plans have never been found to excuse discrimination committed by places of public accommodation, nor could they," he claims "[w]here the [Association] has gone awry is [in] refusing to address its historically discriminatory seats." He maintains the Association "must

31

examine why those seats have historically been discriminatory, address the causes of the problem, and implement and execute a plan to solve it considering the causes." Doing so, he maintains, would enable the Association "to determine an actual factual predicate to underpin an actual affirmative action" program.

In ascertaining the groups it believes are underrepresented in its leadership, the Association does not consider members from the Middle East generally or members of Palestinian origin specifically, nor does it consider religion, notwithstanding that national origin and religion are both protected categories under the LAD. The Association is selective as to the categories it considers to be underrepresented in its leadership and values for inclusion in its at-large seats. Thus, although the Association refers to its program as one of expressive inclusion, it is, by design, also a form of expressive exclusion recognized in Dale.

As both Saadeh and the judge on reconsideration concede, expressive exclusion is not the Association's intent.[8] It is, however, the inevitable effect

---

[8] In his opinion on reconsideration, the judge stated "no one suggests, and it would be absurd for anyone to even intimate on this record, that the Association took steps to expressly exclude Palestinian Muslim lawyers from leadership seats." And Saadeh acknowledges that the Association "never

of how the Association defines underrepresentation and inclusion, at least for its at-large seats. And it is the expression to which Saadeh objects.

Whether viewed as a policy of inclusion or exclusion, however, through its "intentional makeup" of its Board of Trustees, Nominating Committee and JPAC, the Association is expressing its view as to the meaning of the diversity and inclusion it champions. Applying the public accommodations provision of the LAD to compel the Association to abandon its method of selecting its at-large seats significantly burdens its right to oppose a leadership that doesn't guarantee underrepresented groups, as it defines them, "a seat at the table."

It is not for this court to approve or disapprove of the Association's view of diversity or how best to attain it within its leadership. See Dale, 530 U.S. at 661. "[P]ublic or judicial disapproval of a tenet of an organization's expression does not justify the State's efforts to compel the organization to accept members where such expression would derogate from the Association's expressive message." Ibid. As the Supreme Court has unequivocally held, "[w]hile the law is free to promote all sorts of conduct in place of harmful

---

expressed that [he] is unwanted in the 13 seats at issue even though he is not eligible or automatically eligible for them while others are." He also maintains that "[w]ithout such an expression [of intentional exclusion], allowing [him] to obtain said 13 seats cannot violate the [Association's] freedom of expressive association," a statement with which we disagree.

behavior, it is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." Ibid. (quoting Hurley, 515 U.S. at 579).

We close with a word as to why we have elected not to address whether the Association's method for filling at-large seats in its leadership is a valid affirmative action program under the LAD as the Association asserts, or an illegal quota system in violation of the LAD as Saadeh maintains, in favor of resolving this case based on First Amendment grounds. See Facebook, Inc. v. State, 254 N.J. 329, 362 (2023) (noting the general rule of avoiding constitutional questions if a case can be resolved on another basis). We've resolved the case on the constitutional question because we can do so based on well-established precedent whereas the LAD issue is novel with little to guide our inquiry.

As the first judge to address this matter in the trial court noted, there is very little law in the area of affirmative action programs involving private, not-for-profit associations such as the Bar Association, in contrast to the well-established precedent in employment under Title VII, see United Steelworkers v. Weber, 443 U.S. 193, 197, 208 (1979), and the evolving precedent in higher

education under the Equal Protection Clause of the Fourteenth Amendment, see Students for Fair Admissions, Inc. v. President & Fellows of Harvard College, 600 U.S. 181 (2023), neither, in our view, a particularly good fit for analyzing the Association's program in this case. Cf. Sauter v. Colts Neck Volunteer Fire Co. No. 2, 451 N.J. Super. 581, 583 (App. Div. 2017) (holding firefighter voted out of membership in volunteer fire company not entitled to the protections of the Conscientious Employee Protection Act, N.J.S.A. 34:19-1 to -14).

Indeed, the only case the parties cited to us, Doe v. Kamehameha Schools, 470 F.3d 827 (9th Cir. 2006), involving an affirmative action plan employed by a purely private non-profit entity, albeit a school, was written almost twenty years ago and resulted in six separate opinions from the Ninth Circuit sitting en banc. Saadeh's claim that "[a]ffirmative action plans have never been found to excuse discrimination committed by places of public accommodation, nor could they," ignores Chief Justice Rehnquist's observation in Dale that "[a]s the definition of 'public accommodation' has expanded from clearly commercial entities, such as restaurants, bars, and hotels, to membership organizations such as the Boy Scouts, the potential for conflict

between state public accommodations laws and the First Amendment rights of organizations has increased." 530 U.S. at 657.

We conclude that notwithstanding the LAD's prohibitions against discrimination in places of public accommodation and private associations, the Bar Association has a First Amendment right of expressive association that permits it to select the membership of its governing bodies through intentional inclusion of specified underrepresented groups, in furtherance of the ideological position it expresses in numerous ways: that it is necessary and beneficial to promote diversity and inclusion in New Jersey's legal profession. An exploration of the contours of a valid affirmative action program in a purely private, non-profit organization under the LAD will have to await a case in which applying the LAD will not trench on the organization's First Amendment expressive associational rights.

We reverse the order entering partial summary judgment on liability for Saadeh, dissolve the prospective injunction entered against the Bar Association, and remand for entry of summary judgment in favor of the Association dismissing the complaint in its entirety with prejudice. We do not retain jurisdiction.

Reversed and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2201-22